746 A.2d 47 (2000)
NEWARK INSURANCE COMPANY, Plaintiff-Respondent,
v.
ACUPAC PACKAGING, INC. Defendant-Appellant, and
Tarlow Advertising Inc., Defendant.
Superior Court of New Jersey, Appellate Division.
Argued October 6, 1999.
Decided February 23, 2000.
*48 Francis X. Garrity, Montclair, for defendant-appellant (Garrity, Graham, Favetta & Flinn, attorneys; Mr. Garrity and Linda L. Galvani, on the brief).
Stephen B. Fenster, Hackensack, for plaintiff-respondent (Gallo Geffner Fenster, attorneys; Mr. Fenster, of counsel; Valerie A. Vladyka, on the brief).
Before Judges STERN, KESTIN and STEINBERG.
The opinion of the court was delivered by STEINBERG, J.A.D.
In this insurance coverage declaratory judgment action defendant, Acupac Packaging, Inc. (Acupac), appeals from the grant of summary judgment to plaintiff, *49 Newark Insurance Company (Newark), declaring that no coverage exists for the claims presented to Newark by Acupac. In granting summary judgment to Newark, the motion judge held, as a matter of law, that Acupac had not caused physical damage or injury to the property of others. Rather, he concluded that the claim presented was for loss due to a failure of Acupac's "`work' or `product' to meet the level of performance, quality, fitness or durability warranted or represented" by Acupac. He, therefore, concluded that exclusion "m." of the policy barred recovery. In addition, he concluded that exclusion "n." also defeated Acupac's claim since Acupac's product was withdrawn or recalled and replaced because of a known or suspected defect. We disagree with both of those conclusions, and reverse and remand.[1]
According to the certification of Kenneth A. Beck, Vice-President of Acupac, filed in opposition to the motion for summary judgment, Acupac specializes in contract packaging, supplying the cosmetic, pharmaceutical and household good industries with flexible, disposable products. Among the packaging products produced by Acupac are foil laminated pacquettes.
In February 1996, Acupac was contacted by Tarlow Advertising Inc., (Tarlow), an advertising firm for Revlon, and asked to supply 2.2 million pacquettes to be filled with Revlon Almay skin cream lotion.[2] Revlon supplied the lotion in April 1996, and Acupac began the process of manufacturing the pacquettes and filling them with lotion. Acupac understood that each pacquette was to be attached to an advertising card that was part of a Revlon promotion. The cards with the pacquettes attached to them were to be bound in the August 1996 edition of Glamour magazine. Accordingly, the cards had to be assembled with the pacquettes and delivered to Glamour's bindery by June 24, 1996.
Acupac manufactured the pacquettes, filled them with the skin cream lotion, and forwarded them to Color Prelude which was to attach the pacquettes to the advertising cards. The advertising cards, with the pacquettes attached, were then to be sent to the bindery.
On June 28, 1996, Ann Jeremiah, the production manager for Tarlow, telephoned Acupac and advised that the pacquettes were leaking after being bound in the Glamour magazines. Acupac asked that samples be returned to it in order to have its quality department determine if the pacquettes were defective and, if so, in what fashion. During the first week in July 1996, Acupac's quality department determined that the pacquettes were defective, as they could not withstand the pressure applied to them in the binding process. Because the advertising cards were part of a summer promotion of Almay skin cream, Tarlow had new cards inserted in the August edition of Glamour without the pacquettes.
Acupac and Tarlow met to discuss what to do with the 2.2 million advertising cards. Michael Macri, Senior Vice-President of print production for Tarlow, indicated that if the advertising cards and pacquettes could be salvaged, he would discuss with Revlon the possibility of inserting them in the September edition of Glamour magazine. However, Macri indicated that in order to be inserted in the September edition, the condition of the pacquettes had to be remedied by July 24, 1996, a period of two weeks. Macri also said that since this was a summer promotion designed to encourage the purchase of Almay skin cream lotion as a shield against the summer sun, coupled with the fact that the *50 advertising card had a manufacturer's coupon with an expiration date of October 31, 1996, unless the cards and pacquettes could be salvaged in time for insertion in the September edition of the magazine, they would be rendered useless.
Since there was an eight-week lead time to obtain the printed raw material and it would have taken an additional six weeks to assemble and fill 2.2 million new pacquettes, Beck realized it would be impossible to meet the July 24, 1996 deadline. Although Acupac considered removing the defective pacquettes from the advertising cards and attempting to reinforce them, since the pacquettes were attached to the advertising cards with glue and the glue was positioned close to the seal area of the pacquettes, Acupac also determined that the glue would have to be removed before the pacquettes could be detached. Acupac decided that the cost of removing the pacquettes from the cards and then removing the glue from the pacquettes was prohibitive. It also concluded that reinforcing the pacquettes while they were still attached to the cards was not feasible. Accordingly, Acupac decided that from its perspective the only feasible use of the 2.2 million advertising cards was through an alternative means of distribution which did not involve binding the cards into a magazine. However, Tarlow rejected that option since it would not serve Revlon's purposes because the demographics of the readers of Glamour magazine was the target for the promotion. Accordingly, Macri advised Acupac that it had no use for the advertising cards.
Revlon and Tarlow asserted a claim against Acupac in the total amount of $152,980.56. The claim is broken down as follows: (a) lost advertising cards, $27,782.71; (b) the cost of affixing the pacquettes to the advertising cards, $89,221.67; (c) the cost of the bulk skin lotion, $32,609.87; and (d) collateral shipping expenses totaling $3,064.27.[3] Acupac submitted Revlon and Tarlow's claim to Newark requesting coverage. With the exception of the claim for the physical injury to the cards onto which the lotion actually leaked, Newark denied the claim. Shortly thereafter, Newark filed this declaratory judgment action seeking a determination that it had no duty to defend or indemnify Acupac for the claims asserted against Acupac by Revlon and Tarlow for damages related to the pacquettes of lotion. Relying upon exclusions "m" and "n" of the policy, the motion judge granted Newark's motion for summary judgment, resulting in this appeal.
We first consider Acupac's contention that since claims of damage to property owned by Revlon or Tarlow were asserted, the motion judge erred in determining that exclusion "m" applied and that there was no coverage as a matter of law. Under the policy, in the coverage section, Newark agreed to pay ... "those sums that the insured becomes legally obligated to pay as damages because of ... `property damage' to which this insurance applies".
In Section V, the definition section of the policy, property damage is specifically defined as follows:
15. "Property damage" means:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it;
or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
There is a critical distinction between insurance coverage for tort liability for physical damages to other persons or property, and protection from contractual *51 liability of the insured for economic loss caused by improper workmanship. Ordinarily, the coverage is for tort liability for physical damage to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained. Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 240-41, 405 A.2d 788 (1979), citing Henderson, Insurance Protection for Products Liability and Completed Operations What Every Lawyer Should Know, 50 Neb. L.Rev. 415, 441 (1971); Heldor Industries, Inc. v. Atlantic Mutual Insurance Co., 229 N.J.Super. 390, 395-96, 551 A.2d 1001 (App.Div.1988). Typically, therefore, comprehensive general liability insurance polices contain exclusions which are known as "work performance exclusions" or "business risks" exclusions. Indeed, the policy issued by Newark contained exclusion "m" which is a typical "work performance" exclusion. The exclusion provided, in pertinent part, as follows:
2. Exclusions
This insurance does not apply to:

* * *
m. Damage to Impaired Property or Property Not Physically Injured.
"Property damage" to "impaired property" or property that has not been physically injured arising out of:
(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
"Impaired property" is defined in Section V of the policy as follows:
7. "Impaired property" means tangible property, other than "your product" or "your work" that cannot be used or is less useful because:
a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
b. You have failed to fulfill the terms of a contract or agreement;
if such property can be restored to use by:
a. The repair, replacement, adjustment or removal of "your product" or "your work"; or
b. Your fulfilling the terms of the contract or agreement.
By its express terms, therefore, exclusion m. only applies if the property has not been physically injured or is not impaired. Moreover, according to the policy, the property is not impaired if it can be restored to use by the repair, replacement, adjustment or removal of Acupac's product or work.
We must determine whether the damages for which Acupac seeks indemnification from Newark is an economic loss caused by improper workmanship, which is a business risk commonly absorbed as a business expense, or, on the other hand, is the result of an accidental injury to property of others giving rise to tort liability. Weedo v. Stone-E-Brick, Inc., supra, 81 N.J. at 240, 405 A.2d 788; Heldor, supra, 229 N.J.Super. at 396, 551 A.2d 1001. If the risk involves injury to people or damage to property caused by faulty workmanship, the "business risk" or "work performance" exclusion does not exclude coverage. Ibid.
Acupac contends that it is entitled to coverage because the claim asserted against it by Revlon and Tarlow is one for "physical injury" to tangible property and therefore qualifies as "property damage." If the claim asserted against Acupac meets the definition of "property damage" and is not otherwise excluded, the Newark policy affords coverage to Acupac. Acupac contends that the attachment of the defective pacquettes to Revlon's advertising cards caused physical injury to the cards, including the loss of their use. Newark agrees that the advertising cards onto which lotion *52 actually leaked were, in fact, physically injured, but denies that the advertising cards onto which no lotion leaked were physically injured. Newark also denies that the lotion itself was physically injured.
We agree with Newark that in order to be covered under subparagraph (a), there must be an actual physical injury to tangible property. The policy expressly so provides. If there is no injury to tangible property, any coverage would be under subparagraph (b). However, if the claim is under 15(b) of the policy, exclusion "m" would eliminate coverage since the damage would be to property not physically injured or impaired arising out of a defect or deficiency in Acupac's work. Acupac contends that once the defective pacquettes were attached to the advertising cards, the cards themselves were destroyed, as was the lotion in the pacquettes, since there was no economically feasible method of salvaging either. Acupac asserts that separating the defective cards from the pacquettes was not considered, as the cost of removal far exceeded the cost of reprinting the cards. In its appellate brief in support of its claim that the remaining cards were not physically injured, Newark contends that the pacquettes could easily have been removed from the advertising cards without causing actual physical damage to the cards; that any residual glue could have been completely peeled off "without very much effort and without any residue remaining"; the lotion could have been removed and salvaged in a cost effective way, and that the pacquettes could have been used in other types of promotional campaigns such as store promotions, or mail distributions. However, in its counter-statement of undisputed material facts in support of its motion for summary judgment, and in opposition to Acupac's motion for summary judgment, Newark noted a settlement of $152,980.56, reached between Acupac and Revlon and "stipulated to the reasonableness of the Acupac settlement with Revlon".
In granting summary judgment, the motion judge relied upon Weedo, supra,; Heldor, supra, and Unifoil Corp. v. CNA Ins. Cos., 218 N.J.Super. 461, 528 A.2d 47 (App.Div.1987).[4] Accordingly, we begin our analysis with Weedo. There, homeowners instituted suit against Stone-E-Brick, a masonry contractor engaged to pour concrete flooring on a veranda and to apply stucco masonry to the exterior of their home. The completed job revealed cracks in the stucco and other signs of faulty workmanship. The Weedos had the stucco removed and replaced with a proper material. The claim against Stone-E-Brick was for faulty workmanship and the damages claimed were limited to the cost of correcting the work. A similar claim was filed against Stone-E-Brick by another homeowner. Stone-E-Brick requested its insurance carrier to assume the defense of each complaint and indemnify it in the event judgment was rendered against it.
The insurance policy in Weedo provided, with language similar to the language in Acupac's policy, that the insurer agreed to pay "all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence". Speaking for the Court, Justice Clifford observed that "[t]he qualifying phrase, `to which this insurance applies' underscores the basic notion that the premium paid by the insured does not buy coverage for all property damage but only for that type of damage provided for in the policy". Weedo, supra, 81 N.J. at 237, 405 A.2d 788. The Court noted that Stone-E-Brick's *53 provision of stucco and stone generally carried with it such express warranties as may have been made during the bargaining process, as well as implied warranties of merchantability and fitness for a particular purpose. If the work performed by a contractor such as Stone-E-Brick is faulty, either express or implied warranties are breached, subjecting the contractor to damages for repair or replacement of the faulty work. Id. at 239, 405 A.2d 788. The consequence of not performing well is part of every business venture and, consequently, the repair or replacement of faulty goods and work is considered a business expense, or business risk generally borne by the contractor to satisfy its customers. Ibid. Ordinarily, such business risks are excluded from coverage under the terms of the policy. On the other hand, there is a risk of accidental injury to property or persons caused by faulty workmanship which is generally covered by the policy. Id. at 239-40, 405 A.2d 788. As Justice Clifford observed, "[w]hile it may be true that the same neglectful craftsmanship can be the cause of both a business expense of repair and a loss represented by damage to persons and property, the two consequences are vastly different in relation to sharing the costs of such risks as a matter of insurance underwriting". Id. at 240, 405 A.2d 788.
Coverage provided by the insurance policy is generally for tort liability for physical damages to others, and not for contractual liability of the insured for economic losses because the product or completed work is not that for which the damaged person bargained. Ibid. While the line may be fine, simply put, tort liability is covered while contractual liability due to faulty workmanship is not. To illustrate the distinction, Justice Clifford gave the following example:
When a craftsman applies stucco to an exterior wall of a home in a faulty manner and discoloration, peeling and chipping result, the poorly-performed work will perforce have to be replaced or repaired by the tradesman or by a surety. On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the homeowner or his neighbor standing below or to a passing automobile, an occurrence of harm arises which is the proper subject of risk-sharing as provided by the type of policy before us in this case. The happenstance and extent of the latter liability is entirely unpredictable-the neighbor could suffer a scratched arm or a fatal blow to the skull from the peeling stonework. Whether the liability of the businessman is predicated upon warranty theory or, preferably and more accurately, upon tort concepts, injury to persons and damage to other property constitute the risks intended to be covered under the [policy].

[Id. at 240-41, 405 A.2d 788.]
Accordingly, the Court held that the "insured products" and "work performed" exclusions, which are substantially similar to Newark's exclusion m., applied to negate coverage or claims against a contractor for breach of contract and faulty workmanship where the damages claimed were solely the cost of correcting the work itself. Id. at 241-42, 405 A.2d 788.
In Heldor Industries, Inc. v. Atlantic Mutual Insurance Co., supra, relying upon Weedo, we observed that ordinarily the insured assumes the risk of necessary replacement or repair of faulty goods as part of the cost of doing business, but passes on to the insurance carrier the risk of damage to property of third parties caused by the faulty goods. Heldor, supra, 229 N.J.Super. at 396, 551 A.2d 1001. In Heldor, Piper Pools, Inc. (Piper), a seller of swimming pools, alleged that it had received complaints that non-skid paint finish applied to coping material which had been supplied to it by Heldor was peeling, leaving bare aluminum exposed, creating an undesirable appearance as well as an unsafe, slippery condition. However, no personal injury claims had been made against Heldor or Piper, and no claims had *54 been made by swimming pool owners for property damage to their decking or for diminution in their property values, arising out of the allegedly defective coping.
Applying Weedo, we held that the business risk exclusion mandated a denial of coverage since no actual damage to the decking occurred and no claims were made against either Piper or Heldor by swimming pool owners for personal injury or damage to their property. Heldor, supra, 229 N.J.Super. at 396, 551 A.2d 1001. Since the only claim made required the repair or replacement of Heldor's own product, we concluded that the claims asserted fell within the business risk exclusions of the policy. Id. at 397, 551 A.2d 1001. Accordingly, following Weedo, we held that the risk of necessary replacement or repair of faulty goods is part of the cost of doing business and was not covered by the insurance policy. Id. at 396, 551 A.2d 1001.
We next consider Unifoil Corp. v. CNA Ins. Cos., supra. There, we held that the claims asserted against Unifoil, the insured, were essentially for breach of warranty which fell within the business risk exclusion and, consequently, Unifoil was not entitled to coverage. The insured was a producer of foil-laminated paper used in the manufacture of lottery tickets. A supplier and sub-supplier of the insured were apparently responsible for defective lacquer furnished to the insured which, in turn, caused the insured's product to be defective. When tickets were further processed by the insured's customer, the tickets' surface would not retain pre-printing after an opaque covering was scraped off. Thus, the purchasers of the tickets were unable to read the symbols beneath the covering and determine whether they had won prizes. The final recipient of the allegedly defective foil-coated paper brought suit against the insured's customer asserting breaches of warranty under the Uniform Commercial Code. In turn, the insured's customer filed a third-party complaint against the insured, Unifoil, asserting both breaches of warranty and negligence on Unifoil's part.
Correctly recognizing that if physical injury is shown the business risk exclusion does not apply, we concluded that the facts presented "no more than a warranty claim made against [Unifoil] by a customer who suffered economic damages allegedly due to the failure of [Unifoil's] product to perform as specified". Unifoil, supra, 218 N.J.Super. at 471, 528 A.2d 47. Although the allegedly unusable coated paper sold by Unifoil was changed in appearance, we concluded that it was merely enhanced by the services of others in the manufacturing process. We thus concluded that although the original product was printed, coated, cut and distributed, it did not constitute "tangible property physically injured or destroyed" and the claims were, therefore, outside the coverage of the policy. Id. at 471, 528 A.2d 47. Significantly, we recognized that there would be coverage if the defective product caused damage to other tangible property, not merely to intangible enhancements of the original item. Id. at 470, 528 A.2d 47. In disposing of Unifoil's argument that if coverage is not afforded the policy for which it paid substantial premiums was illusory, we observed that if the laminate had proved toxic, or if the foil had separated and cut the holder of the ticket, or if a defect in the ticket caused the material to injure a processor's printing machines or other equipment, the insurer would have been responsible under its policy. Id. at 472, 528 A.2d 47.
We have carefully considered Weedo, Heldor, and Unifoil, and conclude that those decisions do not support the grant of summary judgment in favor of Newark. Here, unlike those cases, claims were asserted for damage to propertythe cardsthat were the property of others, separate and distinct from the pacquettes prepared by Acupac. Simply put, as implicitly recognized by Newark in correctly deciding to pay claims regarding the cards on which the lotion had actually spilled, Acupac contends that its defective product *55 caused damage to other tangible property, not merely to intangible enhancements of the original items. Unifoil v. CNA Ins. Cos., supra, 218 N.J.Super. at 470, 528 A.2d 47.
The business risk exclusion only applies regarding claims for damage to the insured's own work arising out of his faulty workmanship, and does not exclude damage to other property not manufactured or provided by the insured, yet caused by the insured's poor performance. Hartford Ins. Group v. Marson Construction Corp., 186 N.J.Super. 253, 258-59, 452 A.2d 473 (App.Div.1982), certif. denied, 93 N.J. 247, 460 A.2d 656 (1983). In Hartford, we held that a claim against a contractor based upon its improper workmanship on the construction of outside walls which caused recurring structural leaks to metal panels installed by another prime contractor was not within the business risk exclusion and the contractor was entitled to coverage. Id. at 259, 452 A.2d 473. Synthesizing Weedo, Heldor, Unifoil, and Hartford, we must determine whether there exists a genuine factual issue as to whether the remaining cards on to which lotion had not yet leaked were damaged, so as to afford coverage. We note that Acupac does not seek reimbursement for its internal costs in manufacturing and filling the 2.2 million pacquettes with lotion. It has voluntarily absorbed those costs as a business risk it assumed for which it is not entitled to coverage. Rather, Acupac seeks recovery only for the damage it is regarded to have caused to the property of Revlon and any consequential damages that flow therefrom.
In attempting to establish that the balance of the cards were damaged, Acupac relies upon Eljer Manufacturing, Inc. v. Liberty Mutual Insurance Co., 972 F.2d 805 (7th Cir.1992), cert. denied, 507 U.S. 1005, 113 S.Ct. 1646, 123 L.Ed.2d 267 (1993). In Eljer, the product involved was a plumbing system which was manufactured and sold to plumbing contractors nationwide. Within a year after the first units were sold and installed, complaints were made regarding leaks and several hundred products-liability lawsuits were filed, some of them class actions. It was estimated that ultimately five percent of the total number of systems sold would fail in circumstances likely to result in a lawsuit. Speaking for the majority, Judge Posner concluded that for purpose of determining coverage, "physical injury to tangible property" occurred when the allegedly defective plumbing system was incorporated into a larger structure, such as a house or apartment, rather than when the system actually malfunctioned, causing physical damage to the structure. Eljer, supra, 972 F.2d at 814. However, in order to constitute the physical injury as of the date of installation, the expected failure rate must be sufficiently high to mark the product as defective and induce a rational owner to replace it before it fails. Id. at 812. We regard Eljer persuasive and choose to follow it. We hold that if Acupac can establish that it was inevitable that all, or a substantial portion, of the cards would be destroyed once subjected to the binding process, those cards, which belonged to Revlon, were indeed damaged. Acupac was not required to subject the balance of the cards to the binding process (which may have increased the actual damages) in order to insure coverage. The claim would not be one of breach of warranty limited to the cost of repairing or replacing Acupac's defective work. Rather, the claim would be for physical damage to Revlon's property caused by Acupac's defective work.
We reiterate that if Acupac can establish its contention that all or a substantial portion of the pacquettes would have leaked onto the cards if subjected to the binding process, rendering the cards inutile for their intended purpose, coverage should be afforded because the cards were, for all intents and purposes, physically damaged. We consider as factual issues to be resolved by the fact-finder in making the ultimate determination as to whether Revlon's property was damaged, *56 Newark's contentions that the pacquettes could have easily been removed from the actual card without causing physical damage; that the residual glue could have easily been removed or peeled off from the cards; that the lotion could have been removed in a cost-effective way, or that the pacquettes could have been used in other types of promotional campaigns such as store promotions, newspaper inserts, or mail distribution. If the fact-finder concludes that they were damaged, exclusion "m" would not apply unless the fact-finder concludes they were "impaired". Therefore, if the fact-finder concludes that the balance of the advertising cards with attached defective pacquettes could not be restored, they were effectively damaged and not merely "impaired" within the meaning of exclusion m. We express no opinion as to what damages, if any, Acupac may be entitled. Neither entitlement to damages, nor the measure of damages, are subjects of this appeal.
Finally, we consider Acupac's contention that the trial judge erred in concluding that exclusion "n." of the Newark policy bars coverage for the claims. This exclusion, sometimes referred to as the "sistership exclusion" provides, in pertinent part, as follows:
2. Exclusions
This insurance does not apply to:
* * *
n. Recall of Products, Work or Impaired Property
Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal, disposal of:
(1) "Your product";
(2) "Your work", or
(3) "Impaired property",
if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.
Newark contends that the "sistership exclusion" is designed to exclude from coverage expenses involved in recalling or withdrawing a product in which accidents have not yet occurred. Newark asserts that these expenses are excluded from coverage because they are incurred to prevent accidents. We conclude that the "sistership exclusion" has no applicability when the claim is for property damage claimed to have been suffered by another property owner, such as Revlon. See Hartford Ins. Group v. Marson Construction Corp., supra, 186 N.J.Super. at 260, 452 A.2d 473 (sistership exclusion does not, on its face, exclude damage alleged to have been done to the work of another prime contractor); accord: United States Fidelity and Guaranty Co. v. Wilkin Insulation Co., 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926, 934; Champion v. Panel Era Mfg. Co., 410 So.2d 1230 (La.Ct.App.), writ denied, 414 So.2d 389 (La.1982) (sistership exclusion is limited to those cases in which there is a withdrawal of the product from the market, as that term is commonly construed; the exclusion does not apply to damages, in fact, caused by a defective condition, the discovery of which occasions the discontinuation of the product.); see also: Ostrager & Newman, Handbook on Insurance Coverage Disputes, Section 7.02(c)(5). The "sistership exclusion" only applies in those cases where because of the actual failure of the insured's product, similar or "sister" products are withdrawn from use to prevent the failure of these other products, which have not yet failed but are suspected of containing the same defect. Honeycomb Systems, Inc. v. Admiral Insurance Co., 567 F.Supp. 1400, 1406 (D.Me.1983); United States Fidelity and Guaranty Co. v. Wilkin Insulation Co., 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926, 934 (1991). The sistership exclusion, by its very terms, is limited to those costs associated with the withdrawing of a product from the market. It does not exclude from coverage damage already caused to the property of a third *57 party. Accordingly, if the fact-finder determines that the balance of the cards were, in fact, damaged, the sistership exclusion would not apply. Acupac is not seeking reimbursement for any costs associated with a recall. Rather, Acupac is seeking indemnity for property damage it caused to Revlon's property.
Reversed and remanded for further proceedings not inconsistent with this opinion.
NOTES
[1] Acupac filed a cross-motion for summary judgment which was denied. The denial of Acupac's cross-motion for summary judgment has not been appealed.
[2] Although Tarlow was named as a defendant, we are unable to discern from the record supplied us by the parties whether Tarlow formally appeared in these proceedings. In any event, Tarlow has not participated in this appeal.
[3] There is a mathematical discrepancy in the total amount of the claim submitted by Acupac to plaintiff, and the sum of the individual components of the claim. We are unable to account for the discrepancy.
[4] The judge also relied upon the unpublished opinion of Oxford Textile, Inc. v. Royal Ins. Co. of America, A-2111-95 (decided July 1, 1996). Unpublished opinions do not constitute precedent and are not binding upon any court. R. 1:36-3. Moreover, they should not be cited by any court. Ibid. See also State v. One 1979 Pontiac Sunbird, 191 N.J.Super. 578, 581, 468 A.2d 715 (App.Div.1983). In addition, for reasons to be explained more fully in our analysis of Unifoil, supra, we conclude that Oxford Textile is distinguishable from this case.