763 A.2d 339

NANCY CONLON, PLAINTIFF, v. MARTIN
E. CONLON, DEFENDANT.

Superior Court of New Jersey Chancery Division Monmouth County

Decided April 25, 2000.

*Ralph Heuser*, for plaintiff.

*Thomas Baldwin*, for defendant (*Budd, Lamer, Gross, Rosenbaum, Greenberg & Sade*).

CAVANAGH, J.S.C.

The parties in this post-judgment matrimonial matter were married in 1979 and remained together until 1993, when the Plaintiff filed a Complaint seeking a divorce. The final judgment of divorce was entered on May 11, 1995, and included a negotiated

settlement of the financial issues, which was placed on the record at the time of the final hearing. A segment of the agreement required the Defendant to pay alimony to the Plaintiff for a period of twelve years. The amount of the alimony payment was predicated on a base amount of $2,300.00 per month. If the defendant earned in excess of $100,000.00 annually, the payment increased in accordance with a formula set forth in the final judgment. In no event, however, would the Plaintiff's alimony be reduced below the basic monthly stipend.

During the fourth year of the payment schedule, the Defendant filed a motion to terminate alimony retroactive to an earlier date. The request was predicated upon the assertion that the Plaintiff was cohabiting with an unrelated third party of the opposite sex. The Defendant argued that the relationship created an economic impact which justified modification of the alimony payment, and requested a plenary hearing to explore the issue. In response, the Plaintiff filed a cross-motion seeking discovery and an increase in alimony. Subsequently, both parties submitted additional papers, including a second motion by the Defendant to modify alimony due to a reduction in his income, in the event his termination request was denied. In response to the multiple submissions, the Court entered Companion Orders on May 28, 1999, which fixed arrears, mandated specific discovery, established an amount of interim alimony, and scheduled a plenary hearing to examine the monetary impact of the cohabitation arrangement.

While the hearing date was pending, the Defendant again moved to retroactively terminate alimony, relying on the authority in two recent cases. In *Konzelman v. Konzelman,* 158 *N.J.* 185, 729 *A.* 7 (1999)(O'Hern, J., and Stein, J., dissenting), the Supreme Court determined that a provision in a property settlement agreement which provided for termination of alimony in the event of defined cohabitation did not violate public policy and was enforceable without inquiry into the financial impact of the arrangement. Additionally, the Defendant relied upon the suggested "logical extension" of the *Konzelman* reasoning set forth in *Romei v.*

*Romei,* No. FM–14–112–99 (Ch.Div.1999, decided Nov. 10, 1999),[1] wherein pendente lite alimony was summarily terminated due to cohabitation, without an inquiry into the financial consequences of the relationship. The Defendant argues that a coalescence of the reasoning in the two cases justifies the conclusion that evaluation of the economic impact of the cohabitative relationship before terminating alimony is no longer necessary, despite the absence of a contractual agreement to that effect.

At the outset of the factual analysis in this matter, it is pertinent to note that at no time did the Plaintiff deny cohabitating with an unrelated third party, although she argued that it was not necessarily a permanent relationship. She conceded in her initial certification that the parties began living together in November of 1998, and the subsequent filings confirmed that the relationship continued up to the date of the oral argument. The Plaintiff submitted that her living arrangements required each party to contribute to residential costs, and her current budgetary allocations were similar to the payment schedule established with her previous female roommate. It was additionally contended that the parties reached a contractual understanding in 1995, and the Defendant did not bargain for cohabitation as a condition to terminate alimony in their agreement. Further, the mutually agreed upon provision for term alimony provided for a fixed payment with graduated increments, evidencing an intention by the parties to obviate economic considerations below that level, including those which may result from cohabitation. Finally, Plaintiff maintained that the purpose of alimony is to provide a

---

[1] It is noted that the *Romei* decision was rendered at the trial court level. Additionally, no appeal was taken and the opinion was not published. Therefore, it does not constitute binding authority and is limited by the language in *Rule* 1:36–3. *See Newark Insurance Company v. Acupac Packaging Inc.*, 328 *N.J.Super.* 385, 746 A.2d 47 (App.Div.2000). However, it was the subject of a feature article in the New Jersey Law Journal and has received widespread attention, spawning this motion and undoubtedly similar requests statewide. *See* O'Brien, Tim, *Cohabitation Held To End Alimony Even Without a Konzelman Clause*, 158 *N.J.L.J* . 853 (Dec. 6, 1999).

continuation of the standard of living which the parties developed during their marriage, and the proofs demonstrated that during the last seven years the parties lived together the Defendant earned an annual income of approximately $200,000.

The Defendant's latest motion, which effectively seeks a summary judgment, requires the examination of a complex problem involving several interrelated questions. Does a former spouse engaged in a cohabitative relationship with an unrelated third party automatically forfeit durational alimony which was agreed upon at the time of the divorce? Is termination appropriate absent an inquiry concerning the economic impact of the relationship? Should forfeiture occur even though the parties have not identified cohabitation as a disqualifying event in their agreement? A resolution of these issues requires a comprehensive examination of the historical evolution of the interrelationship of alimony and cohabitation from its provenance through the present time.

Our Supreme Court has made it clear that marriage is recognized as a shared enterprise and joint undertaking that is akin in many ways to a partnership. *Konzelman*, 158 *N.J.* at 204, 729 *A.*2d at 17; *Pascale v. Pascale*, 140 *N.J.* 583, 609, 660 *A.*2d 485, 498 (1995). This equitable assessment relates directly to the concept of alimony. *Lynn v. Lynn*, 91 *N.J.* 510, 516, 453 *A.*2d 539, 542 (1982); *Rothman v. Rothman*, 65 *N.J.* 219, 229, 320 *A.*2d 496, 501 (1974). It has also been concomitantly established that alimony is designed to facilitate the continued maintenance of the prevailing party at the standard of living that the dependant spouse was accustomed to prior to separation. *Lepis v. Lepis*, 83 *N.J.* 139, 152, 416 *A.*2d 45, 52 (1980); *Khalaf v. Khalaf*, 58 *N.J.* 63, 70, 275 *A.*2d 132, 136 (1971). The primary purpose of alimony is to permit the spouse to share in the accumulated marital assets to which he or she contributed. *Mahoney v. Mahoney*, 91 *N.J.* 488, 500–01, 453 *A.*2d 527, 533–34 (1982).

Alimony is neither a punishment for the payor nor a reward for the payee. Nor should it be a windfall for any party. It is a right arising out of the marriage relationship to continue to live according to the economic standard established

during the marriage as far as economic circumstances will allow. *Aronson v. Aronson*, 245 *N.J.Super.* 354, 364, 585 *A.*2d 956, 960–61 (App.Div.1991).

The gravamen necessary to modify alimony due to cohabitation is examined at length in a trenchant analysis authored by the Appellate Division nearly a quarter of a century ago. In *Garlinger v. Garlinger*, 137 *N.J.Super.* 56, 347 *A.*2d 799 (App.Div.1975), the Court concluded that while some jurisdictions had determined that a former wife's post-divorce "immoral conduct" was inherently sufficient to end alimony payments, the more widely accepted principle required termination only if there was a resulting economic impact on the needs of the supported spouse. The Appellate Division further opined that the minority view represented a distinctly punitive approach which imposed a moral obligation on a former wife to lead a "chaste" life after the marital relationship terminated or forfeit her alimony payments. Further, the punishment of a former wife for the manner in which she conducted her post-divorce existence, reflected a double standard of morality which, absent a measurable financial effect, could not be justified as a basis to mechanically terminate alimony. *Garlinger*, 137 *N.J.Super.* at 61–63, 347 *A.*2d at 801–03. The role of a court in the resolution of this type of inquiry was clearly defined near the conclusion of the decision.

> It is appropriate to add at this point that we do not intend to condone conduct that may either amount to the commission of a crime or be offensive to moral standards held by substantial segments of the community. But our obligation here is to implement the legal purposes of post divorce support and not to pretend to be keepers of the public morals. *Garlinger*, 137 *N.J.Super.* at 64–65, 347 *A.*2d at 803–04.

An examination of New Jersey case law prior to *Garlinger* discerns the consistency of the holding with the development of the concept over many years. In the specific precursor to that decision, *Suozzo v. Suozzo*, 16 *N.J. Misc.* 475, 1 *A.*2d 930 (1938), it was held more than sixty years ago that the unchastity of a former wife was not a defense to her continuing right to receive permanent alimony. However, the Court concluded that the relationship may be considered as a factor bearing upon the nature and amount of the allowance. Subsequently, the Chancery Division

rejected a request to punish a former wife based solely on her "misconduct" by revoking her alimony. *See Grossman v. Grossman,* 128 *N.J.Super.* 193, 319 *A.*2d 508 (Ch.Div.1974). After emphasizing that a wife is not responsible to a former husband for her conduct after the divorce, the Court underscored the necessity of an economic result from the challenged relationship. It was further determined that cohabitation creates a rebuttable presumption, requiring a dependent spouse to address the contribution from the new adult member of the household. If it reduces her needs, cohabitation may constitute a change of circumstances, which could result in a modification of alimony predicated on an examination on the relevant financial impact on the parties.

Consistent with the foregoing development of the issue in question, the Supreme Court decided the seminal case of *Lepis v. Lepis,* 83 *N.J.* 139, 416 *A.*2d 45 (1980). By defining the concept of changed circumstances and structuring their relationship to support issues after the dissolution of a marriage, the Court provided guidance, which remains in place today, for evaluating postjudgment requests for modification.

In 1983, the Supreme Court rendered definitive direction on the concept under consideration in *Gayet v. Gayet,* 92 *N.J.* 149, 456 *A.*2d 102 (1983) (Schreiber, J., dissenting), by holding that mere cohabitation of a dependent spouse was not a change of circumstances that would justify a *per se* reduction in or termination of alimony. Our highest judicial authority concluded that cohabitation constituted a change of circumstances only if coupled with an economic benefit to either the cohabitant or the supported spouse. Ultimately, a reduction or termination of alimony should only be granted in proportion to the reduction of the dependant spouse's needs.

> The law must be concerned with the economic realities of contemporary married life, not a model of domestic relations that provided women with security in exchange for economic dependence and discrimination. *Lepis,* 83 *N.J.* at 156, 416 *A.*2d at 45...In another context we recently emphasized economic realities rather than status in granting relief to a cohabitant. *Crowe v. DeGioia,* 90 *N.J.* 126, 447 *A.*2d 173 (1982)...The extent of actual economic dependency, not one's conduct as

a cohabitant, must determine the duration of support as well as its amount. *Gayet,* 92 *N.J.* at 154, 456 *A.*2d at 102. (Emphasis added.)

The infusion of the economic qualification into the calculus of this determination distinguishes the inquiry from an impermissible attempt to control the private conduct of an individual in violation of frequently stated public policy. *Gayet,* 92 *N.J.* at 151, 456 *A.*2d at 102. *See also, Melletz v. Melletz,* 271 *N.J.Super.* 359, 364, 638 *A.*2d 898, 901 (App.Div.1994); *Pugh v. Pugh,* 216 *N.J.Super.* 421, 425, 524 *A.*2d 410, 411–12, (App.Div.1987). The majority opinion in *Konzelman* considered this significant area of concern and addressed it in the context of the parties' contractual agreement.

Similarly, we acknowledge that a contractual provision terminating alimony in the event of cohabitation potentially conflicts with the privacy interest of the dependent spouse... The policy that ends alimony on the formation of a new legal bond is in derogation of the dependent spouse's individual privacy, autonomy and the right to develop personal relationships free from interference from either a supporting spouse or the state... We do not minimize the potential impact on the private lives of the parties, as underscored by the dissent... While such an agreement may influence the conduct of the parties, they will have knowingly entered into such agreements, understanding what the provisions entail and, presumably, anticipating the extent to which their freedom of action may be affected. *Konzelman,* 158 *N.J.* at 200–01, 729 *A.*2d at 15.

Against the foregoing backdrop of juridical direction, the Supreme Court majority held in *Konzelman* that a provision in a property settlement agreement terminating alimony due to a defined cohabitative relationship was enforceable. The matrix of the decision evolved from the public policy favoring the use of consensual agreements to resolve litigation, proof that the cohabitative relationship was neither casual nor social, and a determination that the agreement was equitable and voluntary when entered into by the parties.

■ The *sine qua non* of the *Konzelman* decision was the contractual understanding of the parties. As the opinion clearly indicates, the policy of our Courts has long been to encourage settlements and enforce settlement agreements whenever it is fair and equitable to do so. *Konzelman,* 158 *N.J.* at 193–94, 729 *A.*2d at 11–12; *Giangeruso v. Giangeruso,* 310 *N.J.Super.* 476, 478, 708 *A.*2d 1232, 1233 (Ch.Div.1997). Settlement agreements are specif-

ically enforceable in equity, but only to the extent that they are fair and just. *Schlemm v. Schlemm,* 31 *N.J.* 557, 581–82, 158 *A.*2d 508, 521–22 (1960). Similarly, New Jersey has long favored the use of consensual agreements to resolve marital controversies, and the policy of encouraging voluntary agreements has been pointed out as especially important in family matters. *Davidson v. Davidson,* 194 *N.J.Super.* 547, 477 *A.*2d 423 (Ch.Div.1984). Settlement agreements that address conflicting issues underscore the afore stated policy favoring stability of such arrangements in matrimonial matters. *Smith v. Smith,* 72 *N.J.* 350, 360, 371 *A.*2d 1, 6 (1977). In fact, our Supreme Court has concluded that it would be short-sighted and unwise to reject out of hand consensual solutions to vexatious personal matrimonial problems which have been advanced by the parties to address those issues. *Petersen v. Petersen,* 85 *N.J.* 638, 645, 428 *A.*2d 1301, 1304 (1981); *Lepis,* 83 *N.J.* at 154, 416 *A.*2d at 53.

Any remaining doubt regarding the dependency of the *Konzelman* holding on the contract entered into by the parties is fully dispelled by the presentation of the fundamental issue in the majority opinion.

> The question, therefore, is whether an **agreement** between the parties to allow cohabitation to **terminate** alimony obligations can be a valid basis for discontinuing alimony, **without regard to the economic consequences** of that relationship. We are satisfied that the policy considerations that allow the termination of alimony on remarriage support the termination of alimony based on cohabitation **provided that both parties have agreed to this contingency.** *Konzelman,* 158 *N.J.* at 196, 729 *A.*2d at 13. *(Emphasis added)*

As Justice O'Hern, in markedly pithy fashion, categorized the essence of the holding in his dissent, "a deal is a deal." *Konzelman,* 158 *N.J.* at 206, 729 *A.*2d at 18.

The majority opinion also specifically acknowledged the causal relationship between the agreement and the decision to dispense with the *Gayet* requirement to conduct a hearing on the financial implications of the Plaintiff's relationship:

> Nevertheless, a **specific consensual agreement** between the parties to terminate or reduce alimony **based on a predetermined change of circumstances** does not require an inquiry into the financial circumstances or economic status of the

dependant spouse **so long as the provision is fair.** Thus, where **the parties have agreed** that cohabitation will constitute a material changed circumstances, and that agreement has been judged fair and equitable, the Court should defer to the **arrangements undertaken by the parties.** In **that situation** where the dependant spouse has entered into a new marriage-like relationship, the Court need not delve into the economic needs of the dependant former spouse. *Konzelman,* 158 *N.J.* at 197, 729 *A.*2d at 13. *(Emphasis added)*

It is pertinent to note that the trial court in *Romei* was presented with a substantially different situation than the *Konzelman* fact pattern. The parties therein were married for less than five years and there were no children born from their union. At the time of the marriage the Plaintiff was self-supporting, and it is unclear whether she would have been entitled to permanent, rehabilitative or even limited duration alimony at the final hearing. The cohabitation relationship in *Romei* occurred while the Plaintiff and Defendant were still married to each other, and resulted in the birth of a child during the pendency of the divorce action, which was the basis for the order awarding pendente lite alimony. *Cf. G. v. G.,* 67 *N.J. Eq.* 30, 56 *A.* 736 (Ch.1904). Finally, the parties had not entered into an agreement which defined the conditions governing spousal support after the dissolution of the marriage.

The termination of pendente lite alimony in *Romei* presents both a factually and legally distinguishable situation from the instant matter. The result effectuated by that court in a pendente lite situation does not have a compelling effect herein where the parties specifically negotiated a post-divorce alimony provision. However, as a result of the expansive language contained therein, referencing automatic termination of alimony whether or not there is an agreement controlling the issue, this Court has been requested by the moving party to consider the effect of that commentary on the this application.

Despite the significant factual distinctions between the two recent decisions, *Romei* references and interprets the effect of *Konzelman.* The specific sections in the opinion which give rise to the argument proffered by the defendant are presented below.

This Court is of the opinion that clear and uncontroverted cohabitation is a change of circumstances that is also sufficiently fundamental and important to require the automatic termination of alimony. In this situation at hand, where the plaintiff has entered into a new marriage-like relationship, the Court need not delve into the economic needs of the Plaintiff. *Romei v. Romei,* No. FM–14–112–99 (Ch.Div.1999, decided Nov. 10, 1999) at 4–5.

This Court believes that the *Konzelman* Court set the stage for another Court to find that a non-cohabitation clause was not absolutely necessary to terminate alimony. If the facts of the case indicate that cohabitation has been found to exist, tantamount to marriage, alimony can terminate without considering the economics of the parties. *Id.* at 5.

This Court believes to follow the approach of the *Gayet* Court, and place an economic needs test upon this would discourage the institution of marriage. Parties would be discouraged from marrying in an effort to retain their alimony. *Id.*

This Court, however, feels that the Court has the authority to modify or terminate alimony awards in light of "changed circumstances", without making a determination as to economic benefits...The Plaintiff has caused a change in circumstances and the economic benefit that she derives from this cohabitation is immaterial to whether alimony will be terminated. *Id.* at 4.

In the absence of an agreement specifically establishing a contrary understanding, this Court believes that the fundamental principles previously established as determinative for the modification of alimony due to cohabitation remain the same after *Konzelman.*

 The role of a trial court in resolving the issue of cohabitation and its impact on spousal support where a settlement agreement is silent on the issue, must be fulfilled by reliance upon decisional law rather than by construing the settlement agreement. *Ozolins v. Ozolins,* 308 *N.J.Super.* 243, 247–48, 705 *A.2d* 1230, 1232 (App.Div.1998). Salient case law establishes the concept that an award of alimony may be modified following a final judgment of divorce whenever changed circumstances substantially modify the economic conditions of the parties. Among the changed circumstances which will be considered by a trial court is the dependent spouse's cohabitation with another. *Lepis,* 83 *N.J.* at 151, 416 *A.2d* at 51. The critical factor in gauging the effect of cohabitation on alimony is a review of the reduction in financial need of the dependent former spouse after appropriate discovery

and a full inquiry into the question. *Gayet,* 92 *N.J.* at 149, 456 *A.*2d at 102. The extent of actual economic dependency, not one's conduct as a cohabitant, must determine the duration of support as well as the amount. *Gayet,* 92 *N.J.* at 154, 456 *A.*2d at 104.

Where the supporting spouse is successful in establishing cohabitation, a rebuttable presumption is created which requires the dependent spouse to address the economic consequence of the relationship in order for the Court to make an appropriate assessment regarding a modification or termination of alimony. *Ozolins v. Ozolins,* 308 *N.J.Super.* 243, 705 *A.*2d 1230 (App.Div.1998); *Grossman v. Grossman,* 128 *N.J.Super.* 193, 319 *A.*2d 508 (Ch.Div. 1974). The appropriate vehicle for the inquiry generated by the utilization of this process is most often a plenary hearing, and only where the essential facts are clearly established and undisputed should this issue be resolved on the papers filed by the parties. *See Tancredi v. Tancredi,* 101 *N.J.Super.* 259, 244 *A.*2d 139 (App.Div.1968); *Dorfman v. Dorfman,* 315 *N.J.Super.* 511, 515, 719 *A.*2d 178, 180 (App.Div.1998); *Mackowski v. Mackowski,* 317 *N.J.Super.* 8, 12, 721 *A.*2d 12, 14 (App.Div.1998).

The majority opinion in *Konzelman* neither abrogated nor diminished the well developed authority which culminated in the *Gayet* pronouncement regarding cohabitation and the modification of alimony. As the dissent pointed out, the majority avoided confrontation with the *Gayet* holding by utilizing the concept of the freedom of a woman to enter into a contract on the issue. *Konzelman,* 158 *N.J.* at 204–05, 729 *A.*2d at 17. Viewed through a gimlet eye, the Supreme Court simply determined that parties to a property settlement agreement could create a contractual exception therein to the general requirements in *Gayet,* and their agreement would be enforceable if it met equitable standards. The result was predicated upon the well documented public policy favoring the encouragement of voluntary settlement agreements. A compelling example of the deferral of a court to the right of the parties to structure a binding contract on an issue otherwise established, may be gleaned from *Ehrenworth v. Ehrenworth,* 187

*N.J.Super.* 342, 454 *A.*2d 895 (App.Div.1982), where the Appellate Division determined that a matrimonial contract requiring payment of alimony after remarriage was enforceable, despite the contrary language of *N.J.S.A.* 2A:34–25.

The subsisting decisional law of this state, in the absence of an agreement to the contrary, requires a trial court to address the problem of cohabitation and modification of alimony predicated upon the economic impact of the relationship on the needs of the supported spouse. The economic needs test has been evaluated and followed in a majority of jurisdictions. *Konzelman* 158 *N.J.* at 207, 729 *A.*2d at 18; *Gayet* 92 *N.J.* at 153, 456 *A.*2d at 104. This court declines to adopt an interpretation of *Konzelman* which concludes that in the absence of an agreement specifically addressing the issue, cohabitation mandates automatic termination of contractual alimony without consideration of the economic impact of the relationship. Insofar as the language in *Romei* suggests a result broader than the determination necessary to address the pendente lite issue before it, this court does not believe that the *Konzelman* decision contemplated that result.

The expansive interpretation as argued by the Defendant herein, would be particularly onerous to the Plaintiff, who bargained for twelve years of post-dissolution support with no provision for termination due to cohabitation, and who asserts she received no equitable distribution. Granting the Defendant's motion to deny Plaintiff a plenary hearing would foreclose a thorough inquiry into the financial impact of the relationship, thereby amounting to an assault on the fundamental principle advanced in *Gayet,* as well as the other authoritative cases decided in this area. Unlike some jurisdictions, our Legislature has not adopted an anti-cohabitation statute, underscoring the absence of legislative direction for such a procedure in New Jersey. *See Konzelman* 158 *N.J.* at 209, 729 *A.*2d at 20; *Gayet* 92 *N.J.* at 152–53, 456 *A.*2d at 103–04. The holding in *Konzelman* provides no encouragement for the conclusion that the decision was meant to apply to cohabitation matters which are not governed by a specific agreement.

A plenary hearing would insure that an inquiry is conducted into the intent of the parties at the time they negotiated the agreement regarding the reasons to terminate the payment. Further, during the course of the negotiations, did the Plaintiff waive or concede any other benefits in order to secure the alimony payments? *See Ozolins,* 308 *N.J.Super.* at 249, 705 *A.*2d at 1230. What was the understanding of the parties about the establishment of a base amount of alimony, which payment was required regardless of the Defendant's annual income unless it exceeded $100,000.00 at which point the payment would increase? Does the contractual formula which requires the Plaintiff's excess earnings be utilized only as a setoff against an increase in the basic alimony payment, evidence an understanding that no change of circumstances would justify a reduction below the base amount? What were the reasonable expectations of the parties at the time of the agreement concerning cohabitation and termination of alimony based upon the status of the law at that time? *See Innes v. Innes,* 117 *N.J.* 496, 511, 569 *A.*2d 770, 778 (1990).

In the *Konzelman* dissent, Justice O'Hern opined that the majority opinion resulted in a step which turned back the clock on years of efforts to improve the economic and social status of divorced women. The relief sought by the Defendant herein, automatic termination of contractual alimony despite the absence of an agreement to that condition, without a thorough examination of the financial impact of the cohabitative relationship, would represent an exponential free fall backward for those rights, to an extent that even the aforementioned caveat did not anticipate.

The determination sought by the Defendant can not be reached absent a full record established through discovery and an evaluation of the previous questions. The Defendant's motion to summarily terminate alimony is DENIED. The relief sought by the Defendant will be addressed at a plenary hearing which was previously ordered. The cross-motion is GRANTED on the discovery issues, and the information sought is to be furnished forthwith.