903 A.2d 513 (2006)
387 N.J. Super. 224
ATLANTIC MUTUAL INSURANCE COMPANY, a Corporation, Plaintiff-Appellant,
v.
HILLSIDE BOTTLING COMPANY, INC., a Corporation, Briar's U.S.A., Inc., a Corporation, and Snapple Beverage Group, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 24, 2006.
Decided August 9, 2006.
*514 Kevin E. Wolff, Morristown, argued the cause for appellant (Coughlin Duffy Kelly Lisovicz Midlige & Wolff, attorneys; Mr. Wolff, Robert J. Re and Aaron Van Nostrand, on the brief).
Harold A. Jerry, Princeton, III argued the cause for respondents Hillside Bottling Co., Inc., and Snapple Beverage Group (Jerry & Jerry, attorneys; Mr. Jerry and Donna M. D'Anna, on the brief).
William D. Grand, Woodbridge, argued the cause for respondent Briar's U.S.A., Inc. (Greenbaum, Rowe, Smith & Davis, attorneys; Mr. Grand, Ellen A. Silver and David S. Schechter, on the brief).
Before Judges KESTIN, HOENS and SELTZER.
The opinion of the court was delivered by
HOENS, J.A.D.
Plaintiff Atlantic Mutual Insurance Company ("Atlantic Mutual") appeals from the following orders issued by the Law Division judge in this declaratory judgment, *515 insurance coverage action. In three separate orders entered on July 6, 2004, the judge denied Atlantic Mutual's motion for summary judgment and granted summary judgment in favor of defendants Hillside Bottling Co., Inc. ("Hillside"), Stewart's Beverages, Inc. ("Stewart's"), Mistic Brands, Inc. ("Mistic"), and Briar's U.S.A., Inc. ("Briar's"). In two orders entered on September 1, 2004, the judge granted the applications of Briar's, and of Hillside, Stewart's and Mistic, for counsel fees. The December 8, 2004 consent order fixed damages suffered by Hillside and by Snapple Beverage Group ("Snapple").[1] We reverse each of the orders that is the subject of this appeal.
The facts that gave rise to the complaint are not in dispute. Hillside operates a plant, located in Hillside, where it produces soft drinks for various companies. Included among its customers at the time were Briar's, Stewart's and Mistic (collectively, "the beverage companies"). Hillside received certain of the necessary ingredients, including flavorings and sugar, from its customers and stored those materials at the plant. In order to create each specific beverage, Hillside mixed these ingredients together with other ingredients, essentially consisting of carbon dioxide, water, preservatives and citric acid, which it provided to the customers for a cost pursuant to its contract.
Each of the customers gave Hillside its weekly order, and Hillside then created each of the particular beverages in accordance with the appropriate formulae. Hillside bottled the beverage products for shipment, using bottles that it bought from an outside vendor, and which it also supplied for a cost. Part of the process performed by Hillside involved cooling the beverages prior to bottling them by use of a "carbo cooler." That device, consisting of a series of interlocking metal plates, which are refrigerated by ammonia gas, cools the beverages and adds carbon dioxide to them to create carbonated soft drinks.
In December 2001, a quality control inspector for Stewart's noticed that a bottle of the beverage that had been produced by Hillside was discolored. When Stewart's tested the soft drink product, it was found to be contaminated with ammonia. Within days, the New Jersey Department of Health issued a notice requiring all of the soda that had been produced at the Hillside plant to be "detained and embargoed." Hillside alerted its customers that the beverages were contaminated and should not be consumed. Shortly thereafter, Briar's, Stewart's and Mistic recalled all of the beverages that had Hillside's product code. Eventually all of those beverages were destroyed and Briar's, Stewart's and Mistic gave refunds to their affected customers.
In January 2002, Stewart's and Mistic formally demanded that Hillside indemnify them for all costs, losses or damages relating to the contaminated products and the recall. In October 2002, Briar's filed a complaint in the Law Division against Hillside seeking to recover all of its costs and losses incurred as a result of the product recall. In turn, Hillside tendered both of the claims to Atlantic Mutual for indemnification and defense under a Comprehensive General Liability (CGL) insurance policy *516 Atlantic Mutual had issued covering Hillside.
Atlantic Mutual responded by notifying Hillside that its obligation was limited to the $25,000 in coverage afforded pursuant to the Product Recall endorsement, which sum it paid. Atlantic Mutual then filed the complaint that gives rise to this appeal, seeking a declaratory judgment that it was not obligated to defend Hillside or to cover any of Hillside's costs or losses in excess of that sum. While this declaratory judgment litigation was pending, Atlantic Mutual agreed to defend the litigation against Hillside brought by Briar's and by Snapple, on behalf of Stewart's and Mistic, pursuant to a reservation of rights.
In rejecting Atlantic Mutual's motion for summary judgment and in granting the cross-motions, the judge reached a number of conclusions about the CGL policy that Atlantic Mutual challenges on appeal. First, he found that, for coverage purposes, Hillside was providing a service to Briar's and Snapple rather than producing a product. Second, he interpreted the language of the CGL policy defining "your work" and "your product" within the context of the business risk exclusion so that it would be inapplicable to Hillside's claim, by reasoning that the product in question for which Hillside sought coverage was not Hillside's but was the product of Briar's and Snapple. Third, he concluded that exclusion "n", also referred to as the sistership exclusion, did not apply to Hillside's claim because the product being recalled was not Hillside's. Finally, he concluded that the Product Recall endorsement did not apply at all to Hillside's claim. Relying on Newark Ins. Co. v. Acupac Packaging, Inc., 328 N.J.Super. 385, 401, 746 A.2d 47 (App.Div.2000), the judge reasoned that the beverages were the property of the beverage companies rather than of Hillside, that the beverages were not the product of Hillside and that the claims were therefore covered and not subject to the Product Recall endorsement. He found that because Briar's and Snapple lost the value of their products as a result of the contamination, Hillside had damaged the products of others, therefore resulting in a covered claim pursuant to our reasoning in Acupac. Having concluded that the CGL policy provided coverage for Hillside's claim for the damages and losses incurred by its customers, Briar's and Snapple, and that the losses did not fall within any of the exclusions, the judge denied Atlantic Mutual's motion for summary judgment and granted the cross-motions of Hillside and the beverage companies. His orders granting counsel fees and fixing damages followed thereafter.
On appeal, Atlantic Mutual asserts that the motion judge erred in his analysis of the meaning of the CGL policy and urges us to reverse. In general, Atlantic Mutual argues that the motion judge erred by considering the language of the business risk exclusion without first determining whether Hillside was entitled to coverage under the definitions and the insuring clauses at all. Atlantic Mutual argues that in doing so, the judge relieved Hillside of its burden to establish that its claim was a covered one and that he misapplied the language of the policy by narrowly focusing instead on the language of the exclusion. More specifically, Atlantic Mutual argues that the judge erred in his analysis of both the nature of the product and the nature of the claim, failing to recognize that the contaminated beverages were Hillside's product and that its own faulty work cannot give rise to coverage. Because we find merit in this argument, and because we reverse the summary judgment orders on that ground, we need not reach the other arguments Atlantic Mutual has raised on appeal relating to the orders *517 granting counsel fees and the consent order fixing the quantum of damages.
We note that on appeal from an order granting summary judgment, we apply the same standard that governs the analysis by the motion judge. Prudential Property & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App. Div.), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998); see Antheunisse v. Tiffany & Co., Inc., 229 N.J.Super. 399, 402, 551 A.2d 1006 (App.Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989). We therefore must first determine whether, giving the non-moving party the benefit of all reasonable inferences, the movant has demonstrated that there are no genuine issues of material fact. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). We then analyze whether the motion judge's application of the law was correct. See Prudential, supra, 307 N.J.Super. at 167, 704 A.2d 597.
In carrying out our review, we owe no deference to the interpretation of the motion judge on matters of law. See Manalapan Realty, L.P. v. Tp. Committee of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995). This distinction is significant in our review of the issues raised in this appeal, where the facts are not in dispute and the questions before us raise only issues of law.
We begin with a recitation of the settled principles of law that apply to the interpretation of insurance contracts. Where a policy is unambiguous, the Court "should not engage in a strained construction to support the imposition of liability." Longobardi v. Chubb Ins. Co., 121 N.J. 530, 537, 582 A.2d 1257 (1990); see Zacarias v. Allstate Ins. Co., 168 N.J. 590, 594-95, 775 A.2d 1262 (2001). Moreover, even where it is appropriate to afford a liberal interpretation of policy language in favor of coverage, that process does not permit the "perversion of language or the exercise of inventive powers to create ambiguities where they do not fairly exist." Powell v. Alemaz, Inc., 335 N.J.Super. 33, 44, 760 A.2d 1141 (App.Div.2000)(citing National Surety Co. v. Allstate Ins. Co., 115 N.J.Super. 528, 534 (Law Div.1971)).
With these precepts in mind, we turn to the several provisions of the CGL policy that are relevant. In order to be entitled to coverage under the policy, Hillside must first demonstrate that it has suffered a loss that falls within the definition of covered losses. In particular, the CGL policy includes the following language:
Coverage A  Bodily Injury and Property Damage Liability
1. Insuring Agreement
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply . . .
No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments  Coverages A and B.
b. This insurance applies to "bodily injury" or "property damage" only if:
(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
(2) The "bodily injury" or "property damage" occurs during the policy period.
*518 Of particular relevance to the issues on appeal are the following CGL policy definitions:
Section V  Definitions
17. "Property damage" means:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
In addition, the CGL policy defines "your product" and "your work" as follows:
20. "Your product" means:
a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
(1) You;
(2) Others trading under your name; or
(3) A person or organization whose business or assets you have acquired; and
b. Containers . . . materials, parts or equipment furnished in connection with such goods or products.
21. "Your work" means:
a. Work or operations performed by you or on your behalf; and
b. Materials, parts or equipment furnished in connection with such work or operations.
The policy also includes several exclusions relevant to this aspect of our analysis:
2. Exclusions
This insurance does not apply to:
k. Damage To Your Product "Property damage" to "your product" arising out of it or any part of it.
1. Damage To Your Work "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."
Our Supreme Court has addressed the meaning of these provisions, concluding that claims that sound in breach of warranty, whether express or implied, and that are related to claims that the insured's work was faulty or that its product was defective, do not fall within the coverage provided to the insured by this language. Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 237, 405 A.2d 788 (1979). More specifically, in Weedo the Court explained:
These agreements set forth, in fundamental terms, the general outline of coverage, e.g., "for property damage to which this insurance applies." The qualifying phrase, "to which this insurance applies" underscores the basic notion that the premium paid by the insured does not buy coverage for all property damage but only for that type of damage provided for in the policy. The limitations on coverage are set forth in the exclusion clauses of the policy, whose function it is to restrict and shape the coverage otherwise afforded.
[Id. at 237, 405 A.2d 788.]
Atlantic Mutual asserts that the motion judge erred because he failed to begin, as he should have, by considering whether Hillside's claim for losses fell within the language of the Insuring Agreements. Rather, the judge presumed that it did and proceeded directly to an analysis of the exclusions. Atlantic Mutual argues that this analysis was "truncated" and improper.
The motion judge never found that the definitions of "your product" and "your work" were ambiguous. Nor could he, as our Supreme Court has held otherwise. *519 See Weedo, supra, 81 N.J. at 245, 405 A.2d 788. These definitions, however, are central to the Court's interpretation of the risks that are covered. The insuring clauses set forth standard terms of a CGL policy that have well-established meanings. As the Court in Weedo explained:
The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.
[Id. at 240, 405 A.2d 788.]
As Justice Clifford "endeavored to make clear" in Weedo, "the policy in question does not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident." Id. at 249, 405 A.2d 788. Indeed, in explaining this concept, the Court pointed out that the risk of one's own faulty work is always borne by the party performing the work. That party's liability to others for its own faulty work is a matter of warranty and not a matter of insurance coverage. Thus, the Court held:
Where the work performed by the insured-contractor is faulty, either express or implied warranties, or both, are breached. As a matter of contract law the customer did not obtain that for which he bargained. The dissatisfied customer can, upon repair or replacement of the faulty work, recover the cost thereof from the insured-contractor as the standard measure of damages for breach of warranties.
[Id. at 239, 405 A.2d 788 (citing McDonald v. Mianecki, 79 N.J. 275, 282 n. 1, 398 A.2d 1283 (1979); see 525 Main Street Corp. v. Eagle Roofing Co., Inc., 34 N.J. 251, 255, 168 A.2d 33 (1961)).]
We have, in more recent decisions, consistently applied these familiar principles, commenting that "claims for breach of contract and warranty and breach of fiduciary duty clearly do not assert claims for which coverage is provided." Grand Cove II Condo. Ass'n, Inc. v. Ginsberg, 291 N.J.Super. 58, 72, 676 A.2d 1123 (App.Div. 1996). Applying these clear precedents, we are compelled to conclude that the claims for which Hillside sought coverage were not ones that fall within the insuring agreements.
Hillside did not merely provide a service to its customers, during the performance of which it damaged the product belonging to those customers. Rather, Hillside created a product by using some materials that its customers provided and by supplying other ingredients of its own. More significant, however, to our analysis, Hillside was responsible for the introduction of the carbonation into the beverages. It was during this step in the manufacturing process that the ammonia leaked from the carbo-cooler and contaminated the beverages as they were being produced. Because Hillside's work in creating the carbonated beverages was defective, its claim under the Atlantic Mutual policy *520 inescapably seeks coverage for its own faulty performance. It is therefore barred by the Weedo doctrine.
Here, the motion judge erred by focusing on the fact that Briar's and Snapple incurred costs when they recalled the products rather than, as he should have, on the fact that Hillside created a contaminated product. By considering the damage to Briar's and Snapple, he overlooked entirely that this claim, arising as it did from Hillside's work or its product, was not covered, regardless of the extent of the cost of the recall. That is to say, the motion judge analyzed the claim against the policy as if Hillside had damaged its customers and as if the customers had made third-party claims rather than by recognizing that it was Hillside's own product and its own work that caused the recall. Even if the judge had been correct in his finding that Hillside only performed a service for Briar's and Snapple, it was the performance of that service that created the contaminated beverages, as a result of which the claims arise. Viewed in either light, the business risk exclusion applied.
It is also significant to our analysis that Atlantic Mutual, in addition to paying the full amount of the coverage afforded on the Product Recall endorsement, also honored the coverage claims made by Hillside that were themselves based on claims by third-party customers who consumed the tainted beverages and asserted that they were injured. Recognizing that those claims were covered is entirely consistent with the Weedo analysis, for the policy affords Hillside protection for the claims of others who were injured by its products, as were those eventual consumers of the beverages.
The judge's conclusion, that the claim arose from damage by Hillside to the product of the beverage companies, was based in part upon his analysis of our decision in Acupac. There, however, the lotion products supplied by Revlon were placed in foil packages by Acupac. The foil packages, which were glued onto advertising cards, leaked while being bound into magazines. We concluded in Acupac that because the insured's product had failed, causing the lotion to leak onto the cards, which were the product of others, Revlon's claim against Acupac was covered. See Acupac, supra, 328 N.J.Super. at 398-99, 746 A.2d 47. As we explained this coverage concept:
[t]he business risk exclusion only applies regarding claims for damage to the insured's own work arising out of his faulty workmanship, and does not exclude damage to other property not manufactured or provided by the insured, yet caused by the insured's poor performance.
[Ibid. (citing Hartford Ins. Group v. Marson Construction Corp., 186 N.J.Super. 253, 258-59, 452 A.2d 473 (App.Div. 1982), certif. denied, 93 N.J. 247, 460 A.2d 656 (1983)).]
In Acupac, the existence of the two distinct products, one causing damage to the other, was an event that fell within the coverage language.
The judge's conclusion that Acupac required a like result here, however, was flawed. Here, Hillside's act of creating a product, which was faulty and which gave rise to the claims by its customers, does not, in coverage terms, fall within the Acupac rationale. In similar circumstances we have concluded that a swimming pool component manufacturer could not recover under its CGL policy for claims that some of the components it supplied and incorporated into the final product were faulty. See Heldor Indus., Inc. v. Atlantic Mutual Ins. Co., 229 N.J.Super. 390, 396, 551 A.2d 1001 (App.Div.1988). As we noted in Heldor, *521 "the insured assumes the risk of necessary replacement or repair of faulty goods as part of the cost of doing business, but passes onto the insurance carrier the risk of personal injury or damage to property of third parties caused by the faulty goods." Ibid. Here, as in Weedo and Heldor, Hillside's claim was for costs associated with its own faulty work and its own faulty product rather than, as in Acupac, with the damage its product caused to others.
Second, to some extent the Acupac decision cannot inform our analysis because, as Atlantic Mutual points out, the coverage question there related to the impaired property clause. See Acupac, supra, 328 N.J.Super. at 392-93, 746 A.2d 47. That coverage addresses damage to property of others caused by incorporation of the insured's defective work or product, see id. at 392, 746 A.2d 47, and is not relevant to the claim made by Hillside. For the same reason, the judge's reliance on the Ply Gem decision, Aetna Cas. & Sur. Co. v. Ply Gem Indus., Inc., 343 N.J.Super. 430, 778 A.2d 1132 (App.Div.), certif. denied, 170 N.J. 390, 788 A.2d 774 (2001), was flawed as it also addressed the impaired property coverage. In Ply Gem, we held that a manufacturer of fire-retardant plywood could be covered for claims by homeowners for the costs of replacing roofs into which the plywood had been incorporated and could seek recovery based on the impaired property coverage. Id. at 450, 778 A.2d 1132. These decisions, however, do not apply to Hillside's claim nor does their rationale overcome the effect here of the Weedo rule.
Alternatively, the motion judge concluded that Hillside's claim was not excluded under exclusion "n" and he reasoned that it could not be limited by the Product Recall endorsement. Our analysis, however, is to the contrary. Exclusion "n" relates specifically to recall of products and is commonly referred to as the "sistership" provision. It provides as follows:
n. Recall Of Products, Work Or Impaired Property
Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
(1) "Your product";
(2) "Your work"; or
(3) "Impaired property";
if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.
The related provision, a separate rider known as the Product Recall endorsement, provides specific, limited coverage for product recalls under defined circumstances as follows:
1. The Recall Of Products, Work Or Impaired Property exclusion under COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY is amended to afford coverage for "product recall expenses" that you incur for the "covered recall" of "your product".
2. The insurance afforded by this provision is subject to all other terms of the Coverage Part.
3. The following is added to the LIMITS OF INSURANCE section:
Subject to the Each Occurrence Limit, $25,000 is the most we will pay for all "product recall expenses" arising out of the same defect or deficiency. If any amount other than $25,000 is shown in the Declarations as the Product Recall Expense Limit, the amount shown in the Declarations will replace $25,000 as the *522 Limit of Insurance provided for this coverage.
. . .
5. "Covered recall" means a recall made necessary because the insured or a government body has determined that a known or suspected defect, deficiency, inadequacy or dangerous condition in "your product" has resulted in or will result in "bodily injury" or "property damage".
6. "Product Recall Expense" means:
a. The following necessary and reasonable expenses you incur exclusively for the purpose of recalling "your product":
(1) For communications, including radio or television announcements or printed advertisements including stationery, envelopes and postage;
(2) For shipping the recalled products from any purchaser, distributor or user to the place or places designated by you;
(3) For remuneration paid to your regular "employees" for necessary overtime;
(4) For hiring additional persons, other than your regular "employees";
(5) Incurred by "employees", including transportation and accommodations;
(6) To rent additional warehouse or storage space; or
(7) For disposal of "your products", but only to the extent that specific methods of destruction other than those employed for trash discarding or disposal are required to avoid "bodily injury" or "property damage" as a result of such disposal; and
b. Your lost profit resulting from such "covered recall".
c. "Product Recall Expense" does not include any expenses resulting from:
(1) Failure of any product to accomplish its intended purpose;
(2) Breach of warranties of fitness, quality, durability or performance;
(3) Loss of customer approval, or any cost incurred to regain customer approval;
(4) Redistribution or replacement of "your product" which has been recalled by like products or substitutes;
(5) Caprice or whim of the insured;
(6) A condition likely to cause loss of which any insured knew or had reason to know at the inception of this insurance; and
(7) Recall of "your products" that have no known or suspected defect solely because a known or suspected defect in another of "your products" has been found.
Atlantic Mutual asserts that exclusion "n" bars a claim by Hillside for recall of its own product and that the insurer's only liability under the policy for product recall damages is limited to that which is provided by the Product Recall endorsement. The motion judge concluded that both exclusion "n" and the Product Recall endorsement were irrelevant to the coverage issue because the product being recalled was not Hillside's but rather was the product of Briar's, Stewart's and Mistic. As we have concluded, however, the product was Hillside's and the judge, therefore, should have applied exclusion "n" according to its unambiguous terms.
Our analysis of the sistership exclusion leads us to conclude that it separately bars Hillside's claim. The essential focus of this clause limits coverage by excluding the cost of recalling apparently undamaged products to search for damaged components otherwise not yet discovered. Historically, the so-called sistership doctrine required that a manufacturer discovering damage to part of one airplane (referred to as an airship) would automatically initiate *523 a recall of all other similarly equipped airplanes, referred to as the "sister ships," as a precaution to search for the same defect for obvious reasons of public safety. See Arcos Corp. v. American Mut. Liability Ins. Co., 350 F.Supp. 380, 384-85 (E.D.Pa.1972), aff'd, 485 F.2d 678 (3d Cir. 1973). Exclusion "n" was devised to make it plain that in such circumstances, "while [the insurers] intended to pay for damages caused by a product that failed, they did not intend to pay for the costs of recalling products containing a similar defect that had not yet failed." Forest City Dillon, Inc. v. Aetna Cas. & Sur. Co., 852 F.2d 168, 173 (6th Cir.1988).
We have interpreted the sistership exclusion to mean that it limits coverage when the manufacturer recalls all of the products rather than only those with a defect. See Acupac, supra, 328 N.J.Super. at 402, 746 A.2d 47. The federal district court in New Jersey, applying New Jersey law and citing Weedo, has similarly concluded that general product recall costs are outside the coverage of the policy. See McNeilab, Inc. v. No. River Ins. Co., 645 F.Supp. 525, 539 (D.N.J.1986), aff'd, 831 F.2d 287 (3d Cir.1987). Applying this reasoning to the facts in this record, we conclude that exclusion "n" bars the product recall costs Hillside seeks to recover. The recall of the products by Hillside, and, more specifically, by the beverage companies, was a general one, extending to all of the beverages that bore Hillside's plant code without regard to whether they were actually contaminated or not. It thus falls squarely within the sistership concept and the exclusion, which is unambiguous, applies.
Although exclusion "n" therefore bars Hillside's claim, by purchasing the Product Recall endorsement, Hillside bargained for, and secured, limited coverage for costs and losses incurred in a recall of its own product, even if due to its own defective work, notwithstanding the more general language of exclusion "n". The extent of that coverage, however, is set forth by the specific language of the endorsement.
The definition of the costs and losses in the Product Recall endorsement precisely describes the sums sought by the beverage companies from Hillside and, in turn, by Hillside from Atlantic Mutual under the CGL policy. The limited coverage provided by virtue of that endorsement cannot be read to create a broader form of coverage elsewhere in the policy than that for which Hillside bargained. On the contrary, it is plain that if, in general, coverage for product recalls were included in the general insuring agreements, Hillside would have had no need to purchase the endorsement at all. The fact that the insurer offered such an endorsement, and that Hillside bought it, supports our analysis and our interpretation of the limitations of the general clauses. The fact that Hillside opted to purchase that endorsement, moreover, supports the unambiguous nature of exclusion "n" and of the general insuring clauses as they related to product recall costs.
The terms of the CGL policy that govern the claims by Hillside and by the beverage companies are clear and unambiguous. Because we conclude that Hillside's claim as against its CGL policy sought to recover for damages to its own product, we conclude that the claims are not covered, but fall squarely within the business risk exclusion recognized in Weedo. Moreover, because the costs and losses sought to be recovered from Atlantic Mutual are based on the damage sustained from Hillside's product recall, those costs, losses and damages are excluded under exclusion "n" and covered only to the limited extent provided in the Product Recall endorsement.
*524 We therefore reverse each of the orders that is the subject of this appeal and we remand for entry of judgment in favor of Atlantic Mutual.
NOTES
[1] Stewart's and Mistic are apparently entities that are owned by Snapple. During the course of the litigation, Snapple referred to itself as "improperly named" and it pursued its claims against Hillside in the names of Stewart's and Mistic. However, for reasons not clear from the record, Snapple signed the consent order fixing damages and prosecuted this appeal in its own name.