NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3136
_____

PERMASTEELISA CS CORP.,
f/k/a Glassalum Intl. Corp.

Appellant

v.

COLUMBIA CASUALTY COMPANY


On Appeal from the United States District Court
for the District of New Jersey

(D.C. No. 2-06-cv-02439)

District Judge: Honorable Joseph A. Greenaway, Jr.


Submitted Under Third Circuit LAR 34.1(a)
March 12, 2010

Before: AMBRO, SMITH and ALDISERT, Circuit Judges
(Opinion Filed: April 27, 2010)


OPINION OF THE COURT


ALDISERT, Circuit Judge.

    This diversity action requires us to decide, under New Jersey law, the meaning of

an insurance policy term that covers the insured against amounts it becomes "legally

obligated to pay." Construing that term, the District Court granted summary judgment against the insured, Plaintiff-Appellant Permasteelisa CS Corporation f/k/a Glassalum International Corporation ("Permasteelisa"), and in favor of the insurer, Defendant-Appellee Columbia Casualty Company ("CNA"), ruling that under Bacon v. American Insurance Co., 330 A.2d 389 (N.J. Super. Ct. Law Div. 1974), aff'd, 351 A.2d 771 (N.J. Super. Ct. App. Div. 1976), an insured does not become "legally obligated to pay" until the entry of a judgment against it. We conclude that the District Court did not err, and we will affirm.[1]

I.

Because the parties are familiar with the facts and proceedings in the District Court, we will recite them only as necessary to the discussion.

A.    The Curtain Wall Project

In January 2000, Goldman Sachs hired Turner Construction Company as the general contractor for the construction of a forty-two-story office tower (the "Project"). As conceived, the exterior of the building was to be covered by a decorative "curtain wall" comprised of glass panels and an external aluminum "grillwork" system. Turner subcontracted the design, fabrication and installation of this curtain wall to Permasteelisa. By early January 2002, installation of the curtain wall was underway.

---

[1]The District Court had jurisdiction pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1332(a)(1). We have jurisdiction pursuant to 28 U.S.C. § 1291.

According to CNA, defects in the curtain wall first came to light as early as March 2002, when Project consultant Israel Berger Associates observed that certain grillwork components known as "sag rods" had become loose or detached from their "collars." These problems persisted, and on May 4, 2004, Turner, at the direction of Goldman Sachs, instructed Permasteelisa "to immediately stop all work performed on [its] scaffolds at the building perimeter due to safety concerns," including "all exterior work that may cause falling debris and/or materials." (App. 753.) Following the work stoppage, Permasteelisa met with Turner, Goldman Sachs and Goldman Sachs's consultants to discuss the condition of the curtain wall. According to Permasteelisa, Turner and Goldman Sachs demanded on numerous occasions that Permasteelisa repair the grillwork defects at its own cost.

B.    Permasteelisa's Insurance

Upon receiving the curtain wall contract, Permasteelisa enrolled in the Owner Controlled Insurance Program ("OCIP") that Goldman Sachs procured and implemented for the Project. The OCIP Policy was issued by Lexington Insurance Company and covered Permasteelisa only for third-party claims and claims by and against Goldman Sachs.

Permasteelisa also obtained a Contractors' Professional Liability Policy issued by CNA (the "CNA Policy"), with a policy period from November 1, 2003 through November 1, 2004. The CNA Policy's coverage agreement provides in relevant part:

> We will pay all amounts in excess of the self-insured retention up to our limit of liability, which you become legally obligated to pay as a result of . .. a wrongful act . . . that results in a claim anywhere in the world . . . .

(App. 237.) Under the Policy, a "wrongful act" is defined as "a negligent act, error or omission in the performance of professional services for others by you . . . ." (App. 241.) The term "professional services" is defined as "services that you . . . are qualified to perform for others . . . in the capacity of an architect, engineer, land surveyor, or landscape architect. . . ." (App. 241.) A "claim" is "a demand for money or services, naming you and alleging a wrongful act." (App. 240.) Another provision makes the CNA Policy excess insurance over any "other collectible insurance." (App. 244-245.)

In April 2004, Permasteelisa informed CNA by letter of a "potential claim" arising from problems with the curtain wall. In the letter, Permasteelisa requested CNA's pre-claims assistance, but stated that "no formal claim has yet been filed." (App. 183.) In response, on June 3, 2004, CNA sent Permasteelisa a letter reserving its right to deny coverage. Later, at a jobsite meeting in July 2004, CNA directed Permasteelisa not to "admit liability . . . [or] say you're going to do anything." (App. 255.)

C.    Remediation of the Curtain Wall

Meanwhile, Permasteelisa continued investigating the cause of and possible fixes for the grillwork problems. By August 23, 2004, Permasteelisa had nearly finalized a "fixing method" proposal, with which Turner, Goldman Sachs and Goldman Sachs's consultants were in agreement. The parties incorporated the agreed-upon repairs and

4

design modifications into Subcontract Change Order A-34, dated August 25, 2004. Thereafter, Permasteelisa commenced its remediation of the curtain wall.

On January 10, 2005, CNA provided Permasteelisa with its "preliminary" determination that "no claim yet has been asserted against Permasteelisa." (App. 889.) The letter additionally suggested that coverage was foreclosed by the CNA Policy's "other collectible insurance" clause, which made the CNA Policy excess insurance over Permasteelisa's project-specific insurance with Lexington. (App. 890.) On October 4, 2005, CNA sent Permasteelisa a "supplemental" coverage determination, essentially repeating CNA's initial position that the remediation was not covered by the policy. (App. 1171-1173.) According to Permasteelisa, remediation of the curtain wall was complete on or about December 31, 2005, for a total cost of approximately $5.5 million dollars. (Appellant's Br. 19.)

D.    Procedural History

Following its repair of the curtain wall, Permasteelisa sought to recover its remediation costs from Lexington, apparently to defeat CNA's argument that coverage was barred by the CNA Policy's "other collectible insurance" clause. Lexington denied coverage on the ground that no "claim" had been made, as required under the policy. After Permasteelisa demanded arbitration, the arbitrators found in favor of Lexington, ruling that Goldman Sachs had not made a "claim" against Permasteelisa.

On April 21, 2006, Permasteelisa filed suit against CNA in the Superior Court of

5

New Jersey, Law Division, Hudson County, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and seeking a declaratory judgment that CNA is obligated to defend, indemnify, and cover Permasteelisa for the remedial work done to the curtain wall. On May 30, 2006, CNA removed the action to the District Court for the District of New Jersey.

On October 24, 2008, after the close of discovery, both parties filed motions for summary judgment. Permasteelisa sought summary dismissal of various affirmative defenses raised by CNA, and in turn, CNA sought a ruling that it was not ultimately liable to indemnify Permasteelisa for its remediation of the curtain wall. In an opinion dated June 29, 2009, the District Court declared that the dispositive issue was the interpretation under New Jersey law of the CNA Policy phrase "[w]e will pay all amounts . . . which you become legally obligated to pay." Permasteelisa CS Corp. v. Columbia Cas. Co., No. 06-2439, 2009 WL 1874087, at *5 (D.N.J. June 29, 2009). Relying on Bacon v. American Insurance Co., the District Court ruled that the policy term "legally obligated to pay" requires "'the presentation of proofs in a court of competent jurisdiction and a finding by the court or jury of liability.'" Id. (quoting Bacon, 330 A.2d at 393). Because Permasteelisa was not subject to a final judicial judgment, the Court ruled that it was not "legally obligated" to repair or pay for repairs to the curtain wall. Id. at *6. According to the Court, Permasteelisa had voluntarily and unilaterally assumed responsibility for the repairs, and was precluded from recouping the costs of the repair work. Id. This timely

6

appeal followed.

## II.

This Court exercises de novo review over a grant of summary judgment, and we apply the same standard used by the District Court. State Auto Prop. & Cas. Ins. Co. v. Pro Design, P.C., 566 F.3d 86, 89 (3d Cir. 2009). A court may grant summary judgment only if, after drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56, Federal Rules of Civil Procedure. Additionally, under New Jersey law, "[t]he interpretation of an insurance policy is one of law." Nat'l Union Fire Ins. Co. of Pittsburgh PA v. Transp. Ins. Co., 765 A.2d 240, 243 (N.J. Super. Ct. App. Div. 2001). "We exercise plenary review over a district court's interpretation of state law, as well as its conclusion as to the legal operation of an insurance policy." Royal Ins. Co. of Am. v. KSI Trading Corp., 563 F.3d 68, 73 (3d Cir. 2009).

## III.

Permasteelisa's principal contention is that the District Court erred in applying Bacon, 330 A.2d 389, to hold that under New Jersey law an insured becomes "legally obligated to pay" only after entry of a final judgment establishing its liability. Permasteelisa first argues that Bacon is distinguishable, and next argues that Bacon was wrongly decided. We cannot agree with either contention.

Before proceeding we must acknowledge our role as a federal court adjudicating a case under New Jersey law. A federal court exercising diversity jurisdiction must apply the substantive law as decided by the highest court of the state whose law governs the action. Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1373 n.15 (3d Cir. 1996) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). "When the state's highest court has not addressed the precise question presented, [we] must predict how the state's highest court would resolve the issue," id., and to do so, "we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand," Covington v. Cont'l Gen. Tire, Inc., 381 F.3d 216, 218 (3d Cir. 2004) (quotation omitted). Most significantly, the "decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise." Orson, 79 F.3d at 1373 n.15. Although not dispositive, "[t]he decision of an intermediate state court . . . 'is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" Covington, 381 F.3d at 218 (quoting C.I.R. v. Bosch's Estate, 387 U.S. 456, 465 (1967)).

Given our duty to ascertain New Jersey law, we agree with the District Court that the starting point for this analysis is the trial court decision in Bacon v. American Insurance Co., 330 A.2d 389, the lone New Jersey case construing the policy phrase

8

"legally obligated to pay." Moreover, because Bacon was affirmed per curiam by a panel of the Appellate Division "substantially for the reasons set forth in the opinion of the [trial court]," see Bacon, 351 A.2d 771 (N.J. Super. Ct. App. Div. 1976), we view it as an appellate decision "which is not to be disregarded by a federal court unless [we are persuaded] that the highest court of the state would decide otherwise." Covington, 381 F.3d at 218.

In Bacon, 330 A.2d 389, the court held that an insured becomes "legally obligated to pay" only after entry of a final judgment establishing its liability. See id. at 393. There, the plaintiff paper distributor was insured under a liability policy covering "all sums which the insured shall become *legally obligated* to pay as damages . . . ." Id. at 391, 392 (emphasis in original). Turning to that policy, the insured filed a claim to recover certain payments withheld by a buyer ("Union") to offset property damage allegedly caused by defects in the insured's paper products. Id. at 391. After its claim was denied, the insured sued the insurer, arguing that under a variety of New Jersey statutes, it became "legally obligated" to Union as soon as its paper damaged Union's property. Id. at 392. The court rejected that argument, explaining that

> [t]he test of [legal] liability is not the existence of a remedy in the buyer against the seller under the relevant [law], but a determination of responsibility for satisfying such a remedy. There is a clear implication in [the policy] that payment by the insurer was predicated upon an adjudication of the insured's liability to pay "damages." . . . Absent the presentation of proofs in a court of competent jurisdiction and a finding by the court or jury of liability, it cannot be said that the seller is "legally obligated" to pay damages.

9

Id. at 393. Because the insured's liability to Union had not become fixed and established by a final judgment, the court ruled that the insured had not become "'legally obligated' to pay damages to Union." See id. at 394.

Permasteelisa urges us to distinguish this case, arguing that the CNA Policy term "legally obligated to pay" is materially different from that in Bacon, which covered amounts the insured became "legally obligated to pay as damages." According to Permasteelisa, Bacon's "judgment rule" derives from the additional "as damages" language contained in the Bacon policy, and the absence of that language in the CNA Policy compels a different result. We disagree.

Bacon plainly addresses the question of when a legal obligation arises, an inquiry undertaken without reliance on the policy's "as damages" language. This focus is evident from the first sentence of the court's analysis, which carefully articulates the issue under consideration:

> While the term "legally obligated" is undefined in the policy or by our courts, courts in other jurisdictions have defined the term as used in liability policies to signify existence of a legal liability.

Id. at 393. The court's singular focus on the phrase "legally obligated" is clear throughout the opinion. See id. (four times placing the term "legally obligated" in quotation marks, but using no marks around "damages"); id. at 394 (once doing the same). But see id. at 393 (placing "damages" in quotation marks). That focus is confirmed as the court announced its conclusion, which bears repeating here:

> Absent the presentation of proofs in a court of competent jurisdiction and a finding by the court or jury of liability, it cannot be said that the seller is "legally obligated" to pay damages.

Id.

Additionally, Permasteelisa offers no authority for the argument that the phrase "as damages" changes the meaning of "legally obligated." To the contrary, Permasteelisa readily concedes that the term "damages" means either "'[m]oney claimed by, or ordered to be paid to, a person as compensation for a loss or injury.'" (Appellant's Br. 31 (quoting Black's Law Dictionary 445 (9th ed. 2009)).) Because the term "damages" contemplates a either a claim or a judicial order for compensation, we fail to see how the additional phrase "as damages" could have conceivably compelled the "judgment rule" in Bacon.

Permasteelisa additionally contends that the Bacon policy is distinguishable because it contained a "no-action" clause barring the insured from suing the insurer until entry of a final judgment. We disagree. On our reading, the court's analysis of the no-action clause plainly did not relate to its determination of when a legal obligation became fixed, as it was wholly contained in a separate section concerning the "timeliness" of the suit. The court began its analysis,

> [q]uite apart from any issues of liability is the question of the timeliness of plaintiff['s] action against its insurer.

Bacon, 330 A.2d at 394. Interpreting the no-action clause, the court held that

> [t]he language of the so-called "no-action" clause is express and unambiguous, clearly setting out conditions precedent to the insured's right of action against its carrier. . . . [P]rior to suing its carrier the insured must

11

> have in hand a final judgment of damages or a settlement agreement . . . involving the insurer as well as the claimant.

Id. at 394-395. Although the no-action clause had the potential to affect the court's analysis of the term "legally obligated," it plainly did not. In our view, Bacon unequivocally decides the question of when an insured becomes "legally obligated to pay," and we reject Permasteelisa's arguments to the contrary.

Notwithstanding Bacon, Permasteelisa argues that the plain meaning of "legally obligated" includes contractual obligations, and necessarily includes its contractual obligation to provide a functioning curtain wall. Not so. Although a contract is indisputably a legal obligation, under New Jersey law, a professional liability policy does not transfer the risk of breach of contract from the insured to the insurer. As the New Jersey Supreme Court explained in Weedo v. Stone-E-Brick, Inc., 405 A.2d 788 (N.J. 1979),

> [t]he insured-contractor can take pains to control the quality of the goods and services supplied. At the same time he undertakes the risk that he may fail in this endeavor and thereby incur contractual liability whether express or implied. The consequence of not performing well is part of every business venture; the replacement or repair of faulty goods and works is a business expense, to be borne by the insured-contractor in order to satisfy customers.

Id. at 791.

Further, although Weedo was motivated in part by the specific policy language at issue in that case, it has generally been construed to foreclose an insured from seeking indemnification for breach of contract. In Atlantic Mutual Insurance Co. v. Hillside

12

Bottling Co., 903 A.2d 513, 519 (N.J. Super. Ct. App. Div. 2006), for example, the Appellate Division cited Weedo for the proposition that

> the risk of one's own faulty work is always borne by the party performing the work. That party's liability to others for its own faulty work is a matter of warranty and not a matter of insurance coverage.

Id. at 519 (citing Weedo, 405 A.2d at 791). In yet another case, a New Jersey appellate court cited Weedo for the black-letter proposition that "claims for breach of contract and warranty and breach of fiduciary duty clearly do not assert claims for which coverage is provided." Grand Cove II Condo. Ass'n, Inc. v. Ginsberg, 676 A.2d 1123, 1130 (N.J. Super. Ct. App. Div. 1996) (citing Weedo, 405 A.2d 788). It is not surprising, therefore, that Permasteelisa is unable to cite any case in which a contractual obligation between the insured and a potential third-party claimant furnished a "legal obligation to pay" within the meaning of a commercial liability policy. (See Appellant's Br. 28-46; Reply 1-12.) Absent mandatory or even persuasive authority to the contrary, we conclude that the New Jersey Supreme Court would reject Permasteelisa's argument that its contract to provide a curtain wall constituted a "legal obligation to pay" within the meaning of the CNA Policy.

Searching for support beyond the decisions of New Jersey courts, Permasteelisa next relies on Industrial Park Water Co. v. National Fire Insurance Co., No. 98-4263, 2005 WL 372298 (R.I. Super. Ct. Feb. 9, 2005), an unpublished opinion in which a Rhode Island trial court declined to require a final judgment as a predicate to coverage under a policy covering amounts the insured became "legally obligated to pay." Id. at *5. But that

13

decision, too, is unavailing. Permasteelisa's citation of Industrial Park Water succeeds only in convincing us of the paucity of cases finding a "legal obligation to pay" in the absence of a final judgment or settlement. Bacon's judgment rule, by contrast, commands a palpable following and likely represents the view of a majority of courts.[2] Thus, although Industrial Park Water may demonstrate some courts' resistance to the "judgment rule," we do not believe New Jersey's Supreme Court would overrule Bacon on the authority of a single unpublished trial court decision from a foreign jurisdiction.

## IV.

As a federal court applying state law, we must not disregard the Appellate Division's adoption of the holding and reasoning of Bacon unless we are "'convinced by other persuasive data that the highest court of the state would decide otherwise.'"

---

[2]See 7A Couch on Insurance § 103:14 ("The term 'legal liability,' as used in a policy of insurance, means a liability such as a court of competent jurisdiction will recognize and enforce between parties litigant."); see also, e.g., Detroit Water Team J.V. v. Agric. Ins. Co., 371 F.3d 336 (6th Cir. 2004) ("[T]he term 'legal obligation' requires either a judicial determination of liability or a settlement between the insurer, insured and the claimant." (applying Michigan law) (internal quotation marks omitted)); Ripepi v. Am. Ins. Cos., 349 F.2d 300, 303 (3d Cir. 1965) (noting that the "more natural" construction of "the term 'legally obligated' in the insurance contract comprehends the legal obligation which flows from a judgment" (applying Pennsylvania law)); M & M Elec. v. Comm'l Union Ins. Co., 670 N.Y.S.2d 909, 910 (App. Div. 1998) (construing the term "legally obligated to pay" in line with New York's general rule that "[l]iability of the insurer attaches when there is a final judgment against the insured as a result of an obligation imposed by law" (internal quotation marks omitted)); Jones Masonry, Inc. v. W. Am. Ins. Co., 768 S.W.2d 686, 688 (Tenn. Ct. App. 1988) ("[I]t seems clear to this court that the provision of the policy requiring the insurer to pay sums which 'the insured has become legally obligated to pay as damages,' is synonymous with 'to pay all sums established by judgment entered against the insured.'").

Covington, 381 F.3d at 218 (quoting C.I.R. v. Bosch's Estate, 387 U.S. 456, 465 (1967)). After reviewing the parties' contentions and the relevant case law, we predict that the New Jersey Supreme Court would neither overrule nor distinguish Bacon if confronted with the facts of this case. Accordingly, we conclude that the District Court did not err in applying Bacon to hold that, in the absence of a final judgment, Permasteelisa was not "legally obligated to pay" for the remediation of the curtain wall.

The judgment of the District Court will be affirmed.