**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0275-24

SANDRA POLING,

    Plaintiff-Appellant,

v.

ATLANTIC MOBILE HEALTH,
ATLANTIC AMBULANCE,
NICHOLAS VAZQUEZ and
GRANT GOLIGHTLY,

    Defendants-Respondents.

_____

Submitted September 23, 2025 – Decided October 22, 2025

Before Judges Gooden Brown and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-2295-21.

Benjamin M. Del Vento, PA, attorneys for appellant (Benjamin M. Del Vento, Jr., on the brief).

Connell Foley LLP, attorneys for respondents (Jeffrey W. Moryan, of counsel and on the brief; Susan Kwiatkowski, on the brief).

PER CURIAM

Plaintiff Sandra Poling appeals from an August 14, 2024 order granting summary judgment in favor of defendants Atlantic Mobile Health, Atlantic Ambulance,[1] Nicholas Vazquez, and Grant Golightly. The trial court dismissed plaintiff's complaint determining plaintiff raised claims of professional negligence for injuries sustained during ambulance transport but failed to provide expert proof regarding the standard of care or breach by defendant emergency responders. We affirm.

I.

A.

We review the factual record "in the light most favorable to" plaintiff as "the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). On March 23, 2019, plaintiff sustained an injury during transport to the hospital by ambulance owned and managed by defendant, Atlantic Ambulance Corporation d/b/a Atlantic Mobile Health. Individual defendants Vazquez and Golightly, both licensed Emergency Medical Technicians (EMTs), responded by ambulance to a police call for an individual "too intoxicated to

---

[1] Atlantic Ambulance Corporation d/b/a Atlantic Mobile Health is a division of Atlantic Health System.

A-0275-24

take care of herself." They arrived around 1:43 a.m. to find plaintiff appearing agitated and accompanied by police.

Plaintiff testified in her deposition that she had been out at a bar with a friend from around six or seven p.m. on March 22, 2019, her friend left at around eleven or midnight, and plaintiff remained at the bar consuming "maybe one too many" drinks. She left after having "enough to drink," and sat on the sidewalk, emotional as it was the anniversary of her son's death. She recalled police arrived and "pleaded" with her to agree to go to the hospital.

Police advised the EMTs that plaintiff was "found . . . walking around Morristown intoxicated." Vazquez testified when he and Golightly arrived plaintiff was "already kind of yelling and screaming," and Golightly indicated he was unable to take plaintiff's vital signs as she "didn't want to be touched" or transported to the hospital. Plaintiff testified she "really didn't want to get into" the ambulance, and she told them as much. She advised police she wanted to be transferred to a particular hospital, rather than another nearby hospital she felt "killed her son," and this request was accommodated.

Plaintiff indicated she "stepped up into" the ambulance as she did not "want to be on the stretcher." Vazquez explained that plaintiff "did not want to walk to the ambulance so she was placed onto the stretcher with the assistance

3

A-0275-24

of the Morristown cops." He further testified that plaintiff was subsequently buckled in with "all five straps." The ambulance run sheet confirmed that plaintiff was secured but "was uncooperative an[d] agitated" while being loaded into the ambulance around 1:49 a.m.

Golightly drove the ambulance, while Vazquez attended to plaintiff in the back. Plaintiff indicated, once in the ambulance, she and defendants "weren't seeing eye to eye already," and Vazquez explained plaintiff would not allow him to measure any of her vital signs. Plaintiff testified she sat up while the ambulance was moving. Golightly "could hear in the back [of the ambulance] that there was some commotion, that, [Vazquez and plaintiff] were kind of going back and forth" about halfway into the trip. Plaintiff explained "there wasn't physicalness[,]" "it was just verbal."

Plaintiff testified she was upset and yelled, unbuckled herself, and refused to lay down or wear a seatbelt. Vazquez explained:

> [W]hile she was removing stretcher straps, she was very agitated, yelling at [him], [he] . . . tried to calm her down basically through therapeutic communication, just trying to speak to her, letting her know that [they were] going to the hospital that she want[ed] to go to . . . . [And] continued to talk to her to try to calm her and have her put the seatbelts back on.

4

Vazquez further testified that plaintiff "began to smoke an electronic cigarette in the back of the ambulance," refused to stop even after Vazquez informed her that smoking was prohibited, and indicated "she did not care and she was not going to stop." Plaintiff testified that despite being told to stop smoking, she "took a couple of puffs and . . . stopped afterwards," but denied making any statement.

Golightly and Vazquez testified plaintiff stood up from the stretcher and became belligerent. Vazquez elaborated that plaintiff moved "over to the bench seat but still would not secure herself to the bench seat." Plaintiff testified at her deposition that she and Vazquez "both yell[ed] at one another."

Vazquez testified that he requested Golightly "contact the receiving facility and let the receiving facility know that she's agitated and we will need some sort of security help" upon arrival, and Golightly explained he "radioed over for the county dispatcher to contact security at the hospital." Plaintiff indicated the ambulance pulled over at one point, but Golightly and Vazquez both disputed that claim. Golightly testified that at no point, aside from red lights, did he stop the ambulance before they reached the hospital. Further, Vazquez stated:

> having a patient who was threatening to leave the
> ambulance, . . . because she initially started getting up

A-0275-24

when we were on the highway, pulling over on the side of the highway would have been a very dangerous decision to make because if she would have jumped out of the [ambulance], she would have been on the side of the highway.

It is undisputed that at some point after moving to the bench seat, plaintiff threatened to jump from the ambulance. Vazquez testified:

Q: So what happened? She's sitting on the bench seat. Tell me what happened.

A: . . . . [T]hen she was yelling profanities at me and how she was going to jump out of the ambulance. Then she also attempted to get physical with me. So she was aggravated at me at that point because I told her to stop smoking the cigarette and tried to calm her. She started getting aggravated at me for trying to – for whatever reason, she ended up getting aggravated at me, threatened to jump out of the ambulance, and then she did attempt to strike me in the back of the ambulance.

Q: Did she strike you?

A: She did not make contact with me, no.

Q: And then what happened?

A: . . . . So she did try to strike me, and then she started to go to exit the ambulance. We were still transporting at that time so the ambulance was still moving.

Plaintiff denied attempting to strike Vazquez but confirmed she threatened to jump, testifying:

6

A-0275-24

Q: If we go down to the 2:10 [a.m.] time, it says here, 'Patient stated you don't give,' and there's an expletive, 'about me. I am jumping out of the ambulance.' Do you remember saying that?

A: Yes. Because that's how I felt he was acting towards me.

The ambulance run sheet also reflected that around 2:10 a.m. plaintiff "stated, 'you don't give a f[***] about me I am jumping out of the ambulance'" as she "stood up and attempted to strike EMT Vazquez."

The mechanics of what occurred next are disputed. Vazquez testified:

Q: And then what happened?

A: . . . . I did grab her – I did grab her by her shoulder to keep her from exiting the vehicle because the vehicle was moving. When I grabbed her, she did fall down to the ground, so right between the well of the ambulance basically which is the steps coming up and the captain's chair. At that point we were, like I said before, three to four minutes away from the hospital so I made the decision to continue keeping her in that position so I held her with one arm. I held her on the floor and we continued our transport to the hospital where security can come help us get her back onto the stretcher. I did not want to let her up because she did already try to strike me once and did try to jump out of the ambulance.

Plaintiff denied making any attempt to actually exit the ambulance and stated, "I never grabbed for the handle." She testified "[Vazquez] put his hands on" her and that is "when he put [her] down to the floor and put his weight down on [her] and . . . took [her] leg and he pulled [her] leg and twisted it and snapped

7

it."  Further, she stated that Vazquez "put all his pressure[ and] his weight on [her] and took [her] leg, twisted and snapped [her] leg because . . . [she] didn't lay down when he wanted [her] to."

Vazquez denied "leaning on her at any time."  The ambulance run sheet stated Vazquez "grabbed [plaintiff's] left shoulder so she was not able to reach the door latch and exit the ambulance [and w]hen Vazquez grabbed . . . [plaintiff's] left shoulder[,] [she] fell to her knees."  A subsequent entry indicated "Vazquez continued to hold the patient on the floor by her left shoulder until" arrival at Saint Clare's Hospital.

Golightly explained, once the ambulance arrived at the hospital, he "grabbed the security officers and then [they] opened up the rear compartment" where they saw "Vazquez and [plaintiff] on the floor of the ambulance near the . . . door stairwell on the right side of the ambulance passenger side door opening."  He described their positions, stating "the patient was in the stairwell of the ambulance and then [Vazquez] was on the backside of her, on the ground of the ambulance" and he "observed [Vazquez] behind her, holding her shoulders."  Vazquez testified that he "was physically in front of the door so [plaintiff] could not get out of the door that was closest to her."

A-0275-24

Records from Saint Clare's Hospital indicated that upon plaintiff's arrival at "the emergency room she cr[ied] [and] scream[ed] . . . 'they hurt my ankle.'" Hospital records reflect plaintiff's diagnoses included: "[a]lcohol intoxication; [a]ltered mental status; [a]nkle fracture; [and] [p]sychiatric illness." At her deposition, plaintiff confirmed that she "holler[ed] and cr[ied] in pain, . . . 'They did it. They did it. They did it.'"

On March 22, plaintiff filed a complaint against defendants alleging she suffered serious and permanent injury as a result of "the careless and negligent manner in which defendants . . . attended to . . . [p]laintiff, she was caused to fall while in the ambulance."

Defendants engaged experts; plaintiff did not. Defendants' expert David Epstein, MD, an orthopedic surgeon, prepared an independent medical evaluation of plaintiff. The doctor confirmed that plaintiff suffered a fractured fibula, underwent subsequent treatment, including an open reduction internal fixation surgery for the fibula. Dr. Epstein recognized there were varying accounts of the manner in which the injury occurred, but opined that while plaintiff did "state to [him] directly that the injury did not occur from the fall but rather [Vazquez] pulling on her leg . . . it is likely that this happened from a fall, given the nature of this injury."

9

Defendants also retained Paul A. Werfel, MS, NR-P, a professional paramedic and Assistant Professor of Clinical Emergency Medicine, as an expert on the standard of care for EMTs. Professor Werfel prepared a written report dated April 28, 2023. In preparation for his rendering of an opinion regarding the manner in which defendants interacted with plaintiff, Professor Werfel reviewed information including the parties' pleadings, written discovery, deposition transcripts, the police incident report, emergency department records, and ambulance records.

Professor Werfel recounted the details leading to the incident involving plaintiff. He noted that upon arrival, Golightly and Vazquez encountered plaintiff accompanied by police and in a highly intoxicated state. Citing plaintiff's deposition, he found plaintiff became agitated, unbuckled the stretcher's straps, began vaping, became more upset as Vazquez attempted to calm her down, and "stated to EMT Vazquez 'you don't give a f[***] about me, I am jumping out of this ambulance.'"

Professor Werfel's report detailed Vazquez's account of observing plaintiff reach for the door handle, grabbing plaintiff's left shoulder to prevent plaintiff from exiting while the vehicle was in motion, and placing his body

A-0275-24

between plaintiff and the door. Professor Werfel noted that plaintiff "fell to the floor" during this maneuver.

Professor Werfel defined the roles of emergency medical service (EMS) personnel as treatment, stabilization, and safe transportation. Further, he described the standard of care for cases involving EMS as requiring EMTs to

> [o]btain the correct location of the patient[,] [r]apidly and safely respond to the reported location, physically locate the patient[,] [d]o a physical assessment of the patient (assuming the patient is cooperative)[,] [o]btain vital signs and appropriate diagnostic testing[,] [p]ackage the patient for transport to the appropriate facility[,] [s]afely and quickly transport that patient[,] [m]onitor the patient throughout transport[,] [a]ddressing and intervening in any issue that may arise[,] [and] [t]urn over care of the patient to the hospital staff.

The expert opined defendants' conduct was "what one should expect from an ambulance crew and [wa]s well within the standard of care." He concluded Vazquez and Golightly "were faced with an intoxicated, and uncooperative patient [who] ultimately became verbally and physically abusive during transport." He determined that both Vazquez and Golightly were adequately trained and conducted themselves within the standard of care for EMTs throughout their interaction with plaintiff. Further, he found "Vazquez responded emergently to the fact that [plaintiff] created a very real threat to

11

herself by attempting to open the door to the ambulance and jump out while the truck was moving" and he "did very well to try and de-escalate the situation." As for Golightly, Professor Werfel stated, "there is no indication whatsoever that anything . . . Golightly did, or did not do, in any way contributed to [plaintiff's] injury." In Professor Werfel's opinion, "[a]ny alleged injury to [plaintiff] was unavoidable due to the situation that she created."

B.

At the close of discovery in July 2023, defendants moved for summary judgment. Defendants contended, as a matter of law, plaintiff's professional negligence claims could not succeed due to her failure to submit an expert report regarding the standard of care. They argued the standard of care for Golightly and Vazquez was beyond the common knowledge of the average person because they are licensed professionals and subject to state regulation; and, as such, expert testimony was necessary for the claim to proceed to trial.

They emphasized plaintiff never disputed she was inebriated, yelled at defendants, unbuckled herself during transport, vaped and refused to stop when asked, or told Vazquez she was about to jump out of the moving ambulance. Defendants contended the evidence demonstrated Vazquez, a "trained EMT[,] reacted appropriately to the emergent situation [that] unfold[ed] before him."

12

They argued further that "the mechanics of the injury don't tell us whether . . . Vazquez was negligent. It's whether his actions and decisions, when confronted with this particular patient[,] . . . was he reasonable from an EMT standard?" Defendants asserted plaintiff's claim against Golightly was not supported by any evidence.

Plaintiff opposed, contending she made a claim of ordinary negligence, not professional negligence, which did not require expert testimony. She further argued that there remained disputed issues of material fact making summary judgment improper.

On August 14, 2024, the trial court granted summary judgment by order and written statement of reasons. The court found this was "a case alleging negligence by a professional in the course of discharging a duty in a professional capacity," and not mere ordinary negligence. The court observed, "This [was] not a case involving a street altercation or fight that broke out on a bus or a train—it was an altercation that occurred in the course of rendering a professional service."

The court reasoned that both Golightly and Vazquez held EMT licenses, were subject to state regulation, and the incident involving plaintiff occurred during the discharge of their professional responsibilities. The court found both

13

had training on the transportation and de-escalation of uncooperative patients. It concluded that plaintiff was required to present expert testimony regarding the EMT standard of care and found "[w]ithout expert proof, a jury cannot determine what an EMT was required to do or refrain from doing in circumstances" such as those presented here or "whether Vazquez, in particular, adhered to the standard of care or failed to."

The trial court acknowledged there remained disputes of fact as to the precise manner in which the injury occurred, but held resolution of that issue by a jury would be impossible without an expert on the appropriate standard of care and breach, which plaintiff failed to offer. The trial court further noted the absence of any facts regarding Golightly's possible liability and found plaintiff had no plausible claim against him. Consequently, the trial court granted defendants summary judgment.

## C.

Plaintiff appeals from this order and argues: (1) the trial erroneously construed plaintiff's claim as alleging professional negligence and expert testimony is not required; (2) defendants' conduct was "deliberate" and assessment of it was within the common knowledge of the average juror; (3) plaintiff's testimony taken together with defendants' expert's statement that

14

EMTs are not to "strike" patients was sufficient to establish the duty of care and breach; and (4) accordingly, the entities are vicariously liable for "the careless and negligent conduct of defendant employee[s]."

II.

"We review de novo the trial court's grant of summary judgment, applying the same standard as the trial court." Abboud v. Nat'l Union Fire Ins., 450 N.J. Super. 400, 406 (App. Div. 2017) (citing Templo Fuente de Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016)). We initially determine whether the moving party has demonstrated there were no genuine disputes as to material facts. Atl. Mut. Ins. Co. v. Hillside Bottling Co., Inc., 387 N.J. Super. 224, 230 (App. Div. 2006). "[A] determination whether there exists a 'genuine issue' of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 540.

We then decide "whether the motion judge's application of the law was correct," Atl. Mut. Ins. Co., 387 N.J. Super. at 231, as, ultimately, a summary judgment "order is a legal, not a factual question," Port Liberte Homeowners

Ass'n v. Sordoni Const. Co., 393 N.J. Super. 492, 501 (App. Div. 2007). "[C]ourt[s] must analyze the record in light of the substantive standard and burden of proof that a factfinder would apply in the event that the case were tried." Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016). "Thus, 'neither the motion court nor an appellate court can ignore the elements of the cause of action or the evidential standard governing the cause of action.'" Ibid. (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)).

We have reviewed the record in light of applicable legal principles and are satisfied that, contrary to plaintiff's argument, she required an expert to prove that defendants breached the applicable standard of care for EMTs in this situation. Without expert testimony, plaintiff failed to show what a similarly situated EMT was required to do or refrain from doing in these fast-evolving, complex circumstances threatening plaintiff's safety while in mobile emergency transport.

It is well-settled, to establish negligence, a plaintiff bears the burden of proving: "(1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014) (quoting Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013)). "A plaintiff bears the burden of establishing those

elements 'by some competent proof.'" Townsend v. Pierre, 221 N.J. 36, 51 (2015) (quoting Davis, 219 N.J. at 406).

It is equally plain that "[o]ne who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession in good standing in similar communities." Levine v. Wiss & Co., 97 N.J. 242, 246 (1984) (citing Restatement (Second) of Torts § 299A (A.L.I. 1965)). To prove professional negligence plaintiffs must present expert testimony regarding the standard of care and any deviation from it by defendants. See Morlino v. Medical Ctr., 152 N.J. 563, 578 (1998) (citing Rosenberg v. Cahill, 99 N.J. 318, 325 (1985)); Kelly v. Berlin, 300 N.J. Super. 256, 264-66 (App. Div. 1997).

The common knowledge doctrine allows a narrow exception to this expert mandate when "the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience." Est. of Chin by Chin v. St. Barnabas Med. Ctr., 160 N.J. 454, 469 (1999) (quoting Rosenberg, 99 N.J. at 325) (applying the common knowledge doctrine in malpractice matter when doctor caused gasoline to enter a patient's uterus instead of fluid).

To determine whether an expert is required, the test is "whether the matter to be dealt with is so esoteric that jurors of common judgment and experience

17

cannot form a valid judgment as to whether the conduct of the party was reasonable." Scully v. Fitzgerald, 179 N.J. 114, 127 (2004) (quoting Butler v. Acme Mkt., Inc., 89 N.J. 270, 283 (1982)). When properly evaluating a professional's conduct and the circumstances require "a complex assessment of a myriad of factors," the analysis likely falls "beyond the ken of the average juror." See Giantonnio v. Taccard, 291 N.J. Super. 31, 44 (App. Div. 1996) (finding expert testimony regarding funeral director's standard of care in managing a funeral procession and breach of that standard was critical to the viability of negligence by injured driver); see also Davis, 219 N.J. at 407 ("[T]he inspection of fire sprinklers by qualified contractors also 'constitutes a complex process involving assessment of a myriad of factors' that 'is beyond the ken of the average juror.'").

Here, the safe transport and management of a resistant, intoxicated patient by ambulance, in circumstances such as those undisputedly present here, called for the factfinder to conduct a complex assessment of numerous factors within the context of the professional standards for and training of EMTs. Thus, the relevant considerations were beyond the common knowledge of the average juror.

Although the precise movements utilized by Vazquez to stabilize plaintiff were disputed, the critical material facts were not. Plaintiff was intoxicated, argumentative, and defiant of orders. She removed safety restraints, moved off the stretcher, and vaped all while the vehicle was moving on the roadway. This was a rapidly changing situation in which plaintiff's erratic conduct escalated and potentially threatened her safety. At the time plaintiff admittedly threatened to jump out of the moving ambulance, Vazquez, a licensed and trained emergency response professional, was faced "with a split-second decision," which implicated multiple complex factors and considerations. These included Vazquez's and Golightly's relevant prior training, applicable safety standards, plaintiff's unpredictable behavior and belligerence, her intoxication and unwillingness to comply with orders or maintain restraints for her own security, the EMTs' understanding of layout of the ambulance as it impacted the ability to control the situation to protect plaintiff from harm, and the options for most-safely subduing plaintiff and preventing her movement in light of all the failed attempts to gain her compliance.

Accordingly, the court did not err in determining plaintiff could not proceed to trial without expert proof. Plaintiff neither presented an expert report

19

nor attempted to depose defendants' expert. Thus, based on the record before it, the court properly dismissed plaintiff's claims.

We further conclude that no evidence in the record supported claims of negligence against Golightly. Thus, claims against Atlantic Mobile Health and Atlantic Ambulance, as Golightly's and Vazquez's employer, were properly dismissed because vicarious liability claims against an employer for an employee's negligence cannot be sustained when the claim against the employee fails. See Newman v. Isuzu Motors Am., Inc., 367 N.J. Super. 141, 154 (App. Div. 2004) (citing Kelley v. Curtiss, 16 N.J. 265, 270 (1954)).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-0275-24